In re **PULLMAN CONSTRUCTION INDUSTRIES INC., Pullman Sheet Metal Works, Inc., Preferred Piping Inc., and Mid–City Architectural Iron Co., Debtors.**

**Bankruptcy Nos. 87 B 6441–87 B 6444.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Nov. 29, 1989.

As Amended Feb. 2, 1990.

Steven B. Towbin, Towbin & Zazove, Ltd., Chicago, Ill., for debtor.

Larry M. Wolfson, Jenner & Block, Chicago, Ill., for the Goldwyns.

Lawrence Fisher, D'Ancona & Pflaum, Chicago, Ill., for Creditors' Committee.

Mark K. Thomas, Katten, Muchin & Zavis, Chicago, Ill., for Wells Fargo.

Richard C. Friedman, Office of the U.S. Trustee, Chicago, Ill.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

In connection with the Consolidated Hearing on Confirmation of Debtors' Fourth Amended Plan As Modified ("Plan"), and Wells Fargo's Motion to Lift Automatic Stay, the parties having rested, the Court has considered all the admitted evidence and arguments of counsel and all objections and pleadings filed with respect thereto, and now makes and enters the following Findings of Fact and Conclusions

of Law.[1] Pursuant thereto, confirmation will be denied and stay modification and other relief ordered.

## FINDINGS OF FACT

1. On May 1, 1987 ("Petition Date"), Pullman Construction Industries, Inc., Pullman Sheet Metal Works, Inc., Preferred Piping, Inc., and Mid–City Architectural Iron Co. (collectively referred to as "Debtors" or "Pullman") filed petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Their cases have been jointly administered. No Trustee has been appointed. The Debtors have been administering their affairs as Debtors-in-Possession. The trial on which these Findings are founded came to be heard on the confirmation hearing held on the Debtors' proposed Plan under 11 U.S.C. §§ 1128, 1129, and Bankruptcy Rules 3020(b) and 9014; and on the final hearing on Wells Fargo's Motion to Lift Automatic Stay under 11 U.S.C. § 362.

2. Debtors are incorporated under the laws of Illinois, and have their principal place of business in Chicago, Illinois. Pullman Construction Industries, Inc. ("PCI") is the parent Corporation of three wholly-owned subsidiaries: Pullman Sheet Metal Works, Inc. ("Pullman Sheet Metal"), Preferred Piping, Inc. ("Preferred Piping"), and Mid–City Architectural Iron Co. ("Mid–City"). [Pullman Ex. 2, p. 4.]

3. The stock of Pullman Construction Industries, Inc. ("PCI") is owned by Lester and Norma Goldwyn. PCI owns all the stock of the other Debtors (collectively the "Stock"). [W.F. Ex. 38.]

4. (a) The primary business of the Debtors is sheet metal and mechanical contracting. [W.F. Ex. 38.]

(b) Pullman employs approximately 125 people and is primarily engaged in the business of heating, ventilating and air-conditioning ("HVAC") contracting for commercial, industrial and governmental entities. In addition, Pullman designs and manufactures a patented fire damper and related products for the nuclear power industry. [Pullman Ex. 2, p. 1.]

(c) Pullman was founded in 1943 as a sheet metal fabricating company. During the post-war construction boom, Pullman expanded its business to encompass the fabrication and installation of warm air heating, ventilating and air-conditioning ("HVAC") systems in residential and light commercial buildings. During the 1960's Pullman continued to expand its business into commercial high-rise construction projects. In the mid–1970's, after a brief period as a subsidiary of Brand Insulation, Inc., Pullman began providing HVAC contracting services to the nuclear power industry. [Pullman Ex. 2, pp. 5–7.]

(d) Pullman also expanded its business horizontally through the acquisition of Preferred Piping, a plumbing contractor; Mid–City, a manufacturer of gallery work such as gratings, stairs and handrails, principally for nuclear power plants; PCI Engineers, a consulting firm which focused on the energy conservation market for hospitals and schools; and Perfection Fabricators, a sheet metal fabricator for non-ventilation applications. [Pullman Ex. 2, pp. 6–7.]

(e) Beginning in 1982, Pullman attempted to replace its declining nuclear power plant construction business by expanding into the commercial construction markets of Stamford, Connecticut, and Tampa, Miami, and Stuart, Florida. Pullman also added two other business lines in 1984: the manufacture and distribution of a patented fire damper, primarily for use in nuclear power plants; and the installation of "clean rooms", used for the production of semiconductors and compact discs. [Pullman Ex. 2, pp. 7–8.]

(f) The fire damper line of business remains a strong source of revenue for Pullman, while the clean room division has been discontinued. Shortly after the Chapter 11 case began, Pullman terminated its work on all non-Chicago construction projects, in an effort to focus on its core businesses. [Pullman Ex. 2, pp. 8–9.]

---

1. References to Debtors' exhibits shall be [Pullman Ex. __], references to Wells Fargo's exhibits shall be [W.F. Ex. __], references to transcripts of proceedings shall be [Tr. p. __, date].

(g) Prior to the commencement of the Chapter 11 case, Pullman experienced substantial financial losses stemming from its non-Chicago commercial construction business. Pullman suffered losses of $3,269,000 in 1985, $2,919,000 in 1986, and $3,716,000 during the first four months of 1987. Pullman's financial difficulties were caused by a combination of factors, including inadequate accounting systems and other internal controls, unqualified supervisory personnel on non-Chicago construction projects, inaccurate job cost estimating, and management's decision to complete major projects at a loss rather than abandon them. [Pullman Ex. 2, pp 8–9.]

(h) Pullman's Chapter 11 case was commenced as a result of its significant and continuing financial losses from its Connecticut and Florida operations; increasing pressure from unions, insurance companies, subcontractors and other creditors for payment of past due obligations; and Pullman's inability to reach a satisfactory agreement to restructure its debt due to the Wells Fargo Bank (the "Bank"). When management's efforts to effectuate a sale or merger of Pullman proved unsuccessful, Pullman sought relief under Chapter 11. [Pullman Ex. 2, pp. 8–9.]

*Pullman's Post–Petition Operations*

5. (a) Pullman has operated much more efficiently since the commencement of its Chapter 11 case, notwithstanding extensive administrative expenses and certain restrictions on its operations due to a Chapter 11 business environment. Soon after the Chapter 11 case was filed, Pullman contracted its business operations by completing the liquidation of its Connecticut and Florida operations. [Pullman Ex. 2, p. 9.]

(b) From May 1, 1987 through April 30, 1989, Pullman had operating income of $1,869,000, extraordinary Chapter 11 expenses of $1,663,000, and write-off from its Florida operations of $120,000, leaving Pullman with net post-petition income of $86,000 (before debt service would be taken into account). [Pullman Ex. 21.] Pullman's April 30, 1989 balance sheet reflects total assets of $6,754,000, total liabilities of $14,499,000 (including all pre-petition debt) and a negative shareholders' equity of $7,745,000. [Pullman Ex. 22.]

(c) Since Pullman discontinued its out-of-town operations, it has been able to concentrate on its core businesses. Despite Pullman's inability to obtain bonding from a commercial surety since the commencement of its Chapter 11 case, Pullman has nevertheless continued to obtain a significant amount of new work, at acceptable profit margins. Pullman has averaged in excess of $1,000,000 of "earned revenue" monthly for the two years in which Pullman has operated under Chapter 11. [Pullman Ex. 21.] Total new sales from May 1, 1987 through April 30, 1989 were in excess of $29 million. [Pullman Ex. 27.]

(d) The continuity of business operations which Pullman ha., enjoyed is due, in part, to the special procedure utilized for the payment of pre-petition lien claims. This procedure was approved by the court early on in the Chapter 11 proceedings and has been successfully implemented. Under this procedure, Pullman has paid $2,549,463 of pre-petition lien claims, without the need for a single hearing. [Pullman Ex. 20.] As a result, Pullman has continued its business operations without interruption or delay and has not been required to abandon any construction project in the Chicago metropolitan area since the commencement of the Chapter 11 case.

(e) Additionally, Pullman assumed many of its pre-petition collective bargaining agreements, namely those with Sheet Metal Workers' Local 73, Sheet Metal Workers' Local 265, United Association Local 306, United Association Local 497, United Association Local 507, United Association Local 514 and Plumbers' Local 130. Pullman has now cured all pre-petition monetary defaults under the assumed collective bargaining agreements and has paid, in aggregate, $801,596 to achieve that result. In addition, Pullman paid approximately $490,000 to employees after the commencement of the Chapter 11 proceedings on account of pre-petition wages, benefits and related tax claims in order to maintain continuity in the business. Consequently, Pullman

presently enjoys an excellent working relationship with all labor organizations and fringe benefit funds necessary for Pullman's post-confirmation operations, as well as with its non-union employees. [Pullman Ex. 2, p. 11.]

(f) Also during the Chapter 11 case, Pullman reached comprehensive settlements with General Electric Capital Corporation ("GECC") and Signal Capital Corporation ("Signal") to restructure long term obligations arising under certain equipment lease agreements. The settlements with GECC and Signal enabled Pullman to retain all of the equipment necessary for its present and future operations at a reduced cost, while returning unneeded equipment. [Pullman Ex. 2, pp. 11–12.]

(g) Additionally, Pullman assumed a modified version of the pre-petition lease agreement for its principal place of business. This lease assumption has resulted in substantial cost savings. Under the assumed modified lease agreement, Pullman is entitled to remain in its present location through the year 2001 at a reasonable rent. [Pullman Ex. 2, p. 12.]

(h) Further, during the Chapter 11 case through June of 1989, Pullman has paid the Bank, or transferred property to it of an aggregate value of $732,000 [2] [Pullman Ex. 24] comprised of the following components:

| | |
|---|---|
| Periodic Adequate Protection Payments | $475,000 |
| Liquidation Proceeds of Excess Equipment and Inventory | 177,000 |
| Florida Equipment Transfer | 80,000 |
| | $732,000 |

## PULLMAN'S PLAN

*Financing, Management and Capital Structure*

6. (a) Pullman's Plan is premised on new financing of $2.08 million comprised of [Pullman Ex. 3, p. 13]:

| | |
|---|---|
| New Equity Investment | $ 750,000 |
| New Bank Line Credit | 1,000,000 |
| New Shareholder Loan | 330,000 |
| | $2,080,000 |

(b) The new bank loan of $1,000,000 would be secured by substantially all of Pullman's assets. It would also be guaranteed by Messrs. Lester and John Goldwyn, two of reorganized Pullman's shareholders and officers. In addition to their personal guaranty of the new bank loan, Messrs. Lester and John Goldwyn would loan Pullman $330,000. With the exception of current interest, repayment of the shareholder loan would be subordinated to all of Pullman's Plan obligations. [Pullman Ex. 2, p. 25.]

(c) Pullman's new equity financing would be provided as follows [Pullman Ex. 2, 19]:

| | |
|---|---|
| Lester H. Goldwyn | $390,000 |
| John P. Goldwyn | 225,000 |
| Norma Press Goldwyn | 60,000 |
| Robert F. Cekanor | 37,500 |
| George E. Zielinski | 18,750 |
| Niranjan S. Choksi | 18,750 |
| | $750,000 |

(d) Lester and Norma Goldwyn would be the only stockholders of reorganized Pullman that were also stockholders of Pullman at the commencement of the Chapter 11 case. John P. Goldwyn, Lester Goldwyn's son, and Messrs. Cekanor, Zielinski and Choksi are currently officers of Pullman and will become stockholders of reorganized Pullman upon confirmation. [Pullman Ex. 2.]

(e) The hope and opportunity to become stockholders of reorganized Pullman was one of the reasons that Messrs. Cekanor, Zielinski and Choksi continued with Pullman during the Chapter 11 case. In turn, Pullman's degree of success and stability during the Chapter 11 case are due, in part, to the efforts of Messrs. Cekanor, Zielinski and Choksi.

*Treatment of Claims and Interests*

(f) *The Unclassified Claims.* The Plan divides claims into seven classes and equity interests into two classes. Administrative

---

**2.** This amount does not include either current adequate protection escrow of approximately

$700,000 or the Sheraton Claim settlement proceeds of $687,000 that have been recovered.

claims [3] and priority tax claims [4] are not classified, *see* 11 U.S.C. § 1123(a)(1), but Debtors assert that they are treated in accordance with § 1129(a)(9)(A) and § 1129(a)(9)(C) respectively.

(g) *The Class 1 Claim.* The Class 1 Claim is held by Robertshaw Controls Co. ("Robertshaw"), a mechanics' lien claimant with respect to the construction of the Sheraton Hotel in Stamford, Connecticut. Robertshaw's $64,645 mechanics' lien claim was under the Plan to be satisfied in full by the payment of $48,484 on confirmation. Robertshaw voted its Class 1 Claim to accept the Plan. [Pullman Ex. 6.]

(h) *The Class 2 Claims.* The Class 2 Claims aggregate approximately $48,000. These claims, held by former employees of Pullman, are entitled to priority under § 507(a)(4). The Plan provides for their payment over a one-year period following confirmation, with twelve percent (12%) interest, pursuant to § 1129(a)(9)(B)(i). The Class 2 creditors also voted to accept the Plan. [Pullman Ex. 7.]

(i) *The Class 3 Claim.* The Class 3 Claim is held by Signal. This Court has previously held that the Signal Claim is an administrative claim, not entitled to vote on the Plan. While Pullman appealed that ruling, the appeal was dismissed as being taken from an interlocutory order. *See* Order of Dismissal dated March 29, 1989, entered in 88 C 7743 (N.D.Ill.) (Hart, J.). Thus, the Signal claim's separate classification, and Signal's acceptance of the Plan, have no impact on the court's determination of whether the requirements of § 1129 have been met. Signal did cast a ballot to accept the Plan.

(j) *The Class 4 Claim.* The Class 4 Claim is the Wells Fargo Bank's allowed secured claim (the "Bank"). Because the Bank has not made an election under § 1111(b) to have its undersecured claim treated as though it is fully secured, application of § 506(a) is required to divide the

Bank's aggregate pre-petition claim of $8,038,138 into secured and unsecured portions. Debtors contend that the value of the Bank's Class 4 Claim as of the Plan's Effective Date, without regard to the value of the Contract Claims or Preference Claims, is $3,274,000, derived as follows [Pullman Ex. 49 and 50]:

| | Aggregate Value |
|---|---|
| Most Likely Net Present Value of Free Cash Flows | $3,411,000 |
| Excess Cash Excluding Proceeds of Sheraton Claim Settlement Before Reorganization Adjustments | 717,000 |
| Sheraton Claim Settlement Proceeds | 687,000 |
| Payments/Transfers to Bank During Chapter 11 Case as Adequate Protection | 732,000 |
| Most Likely Aggregate Value of Pullman Estate as of the Plan's Effective Date | 5,547,000 |
| Less "Costs to Reorganize" and Priority Lien Claim of Robertshaw | (2,273,000) |
| Net Value Offered by Plan to the Bank | $3,274,000 |

Debtors' Plan proposes to pay that sum to the Bank as follows:

| | |
|---|---|
| Payments/Transfers heretofore made to Bank During Chapter 11 Case as Adequate Protection | $ 732,000 |
| Sheraton Claim Settlement Proceeds | 687,000 |
| Cash at Confirmation | 1,855,000 |
| | $3,274,000 |

Under the Plan the Bank would receive, in full satisfaction of its Class 4 Claim, cash in an amount equal to the value of the Bank's lien interest in Pullman's property, less the value of all Pullman's property transferred to the Bank during the Chapter 11 case ($732,000). That net amount is $2,542,000, including the Sheraton Claim settlement proceeds. In addition, on the Plan's Effective Date the Bank would receive on account of its Class 4 Claim all "Contract Claims," the proceeds of all "Preference Claims," and the right to pros-

---

**3.** Unpaid professional fees are estimated by Debtor to be $560,000 as of the Plan's Effective Date.

**4.** Tax claims asserted to be entitled to priority under § 507(a)(7) total $1,536,250 and would be

paid $85,347 quarterly (which amount includes anticipated applicable statutory interest), commencing June 30, 1989 and ending September 30, 1993.

ecute the Preference Claims in Pullman's name. Those Preference Claims have an aggregate face value in excess of $3,000,-000 [Pullman Ex. 78.], but Debtors have not established their actual or likely value.

The Bank has voted its Class 4 Claim to reject the Plan. Consequently § 1129(b)(2)(A) must be applied for the Plan to be confirmed.

(k) *The Class 5 Claim.* The Bank did not make an election under § 1111(b) to have its undersecured claim treated as a fully secured claim. Thus, the Class 5 Claim is the Bank's unsecured claim resulting from the application of § 506(a). The final allowed amount of the Bank's Class 5 Claim was not to be determined until the Contract Claims and Preference Claims (collectively, the "Claims") are fully liquidated. Before ascertaining those Claims, the amount of Bank's Class 5 Claim computed by Debtors is $4,764,138, [Pullman Ex. 61] derived as follows:

| | |
|---|---|
| Bank's Aggregate Pre–Petition Claim | $8,038,138 |
| Less the amount offered on Bank's Class 4 Claim (without regard to value of Preference and Contract Claims) | (3,274,000) |
| Bank's Provisional Class 5 Claim | $4,764,138 |

The Plan proposes to satisfy the Bank's Class 5 Claim by payment of $131,000 on the Effective Date. This represents an immediate cash dividend of approximately three percent (3%) on account of the Bank's Class 5 Claim. Should the Bank collect on the Claims, however, the percentage dividend would increase as the amount of the Bank's Class 5 Claim would decline.

For example, if the Bank were to collect $1,000,000 from the prosecution of the Claims, its allowed Class 4 Claim would increase from $3,275,000 to $4,275,000, and its allowed Class 5 Claim would decline from $4,764,000 to $3,764,000. This would result in an increase of its dividend from three percent (3%) to three and one-half percent (3.5%).

The Bank has voted its Class 5 Claim to reject the Plan. Consequently, application of § 1129(b)(2)(B)(ii) is necessary for the Plan to be confirmed. Because Debtors contend that the full going concern or reorganization value has been attributed to the Bank's Class 4 (secured) Claim, they argue that any payment on account of the Bank's Class 5 (unsecured) claim will result in compliance with the fair and equitable standard of § 1129(b)(2)(B)(ii), as the holders of junior Class 8 and 9 equity interests will neither receive nor retain any property under the Plan "on account of such junior interests."

(*l*) *The Class 6 Claim.* Class 6 Claims are all unsecured claims not entitled to priority under § 507, except for the Bank's Class 5 deficiency claim. Class 6 Claims are generally held by Pullman's trade creditors and suppliers.

Pullman's Plan provides for the satisfaction of Class 6 Claims by the payment of six-tenths of one percent (.6%) of Pullman's "Earned Revenue"[5] for each of the following "Plan Periods": April–December of 1989; 1990; 1991; 1992; and 1993. Payment of the Class 6 dividend is to be made on or before March 31 of the year following each of the Periods. [Pullman Ex. 1.]

Debtors project that their Earned Revenue for each of the Plan Periods will be as follows [Pullman Ex. 3]:

| | |
|---|---|
| 1989 (9 mos.) | $11,164,000 |
| 1990 | 17,479,000 |
| 1991 | 18,785,000 |
| 1992 | 20,356,000 |
| 1993 | 22,387,000 |
| | $90,171,000 |

By application of a six-tenths of one-percent (.6%) multiple, and use of an eighteen percent (18%) discount rate reflecting both risk and the time value of money, Debtors estimate the present value of the contingent Class 6 dividend at $336,000, derived as follows [Pullman Ex. 17]:

---

**5.** "Earned Revenue" is defined in the Plan as Pullman's post-confirmation earnings less costs, as reported in its periodic financial statements prepared in accordance with generally accepted accounting principles.

| Period | Revenue | Earned Revenue | Factor | Present Value |
|---|---|---|---|---|
| 1989 (9 mos.) | $11,164,000 | $ 67,000 | 0.847 | $ 59,000 |
| 1990 | 17,479,000 | 105,000 | 0.718 | 79,000 |
| 1991 | 18,785,000 | 113,000 | 0.609 | 71,000 |
| 1992 | 20,356,000 | 122,000 | 0.516 | 66,000 |
| 1993 | 22,387,000 | 134,000 | 0.437 | 61,000 |
| | $90,171,000 | $541,000 | | $336,000 |

Class 6 Claims are held by more than 800 creditors and total $8 million, of which $4.7 million is disputed. Pullman's estimate of allowed Class 6 Claims is $6 million. Application of the formula using the net present value of the Class 6 dividend ($336,000) as the numerator, and $6 million as the denominator, results in the calculation of a contingent dividend of approximately five and six-tenths (5.6%).

The Class 6 creditors have voted to accept the Plan. [Pullman Ex. 100.]

(m) *The Class 7 Claims.* Class 7 claims are held by certain of Pullman's insiders. These claims total $655,000. Using a dividend factor of five and six-tenths percent (5.6%), the same as the holders of Class 6 Claims would receive, the dividend payable on account of the Class 7 Claims would be $36,680. [Pullman Ex. 18.]

On the other hand, the Class 7 creditors have received transfers aggregating $56,858, which may be voidable pursuant to § 547. The preference liability of the Class 7 creditors is disputed.

Under the Plan, Class 7 creditors would neither retain nor receive any property on account of their claims, except for a release from their potential but disputed liability under § 547. Given the cost and risk of litigation to recover the potential preferences, plus the fact that the Class 7 creditors are contributing to funding the Plan, Debtors argue that the separate classification and treatment of the Class 7 Claims is justified, does not discriminate unfairly and is fair and equitable in the circumstances.

The Class 7 creditors have voted unanimously to accept the Plan.

(n) *Class 8 and 9 Interests.* Pullman's existing common and equity interests are divided into Classes 8 and 9 under the Plan.

Debtors argue that under the Plan the holders of these interests will not receive or retain any property "on account of" their interests. On the Plan's Effective Date, these interests would be cancelled. Consequently, under § 1126(g), the holders of the Class 8 and 9 interests are deemed to have rejected the Plan. Thus, application of § 1129(b)(2)(C) is required to confirm the Plan over the equity interest holders' deemed rejection.

(o) *Plan Funding and Payments on the Effective Date.* The following is a summary of the Debtors' Plan funding sources and required cash payments on the Plan's Effective Date [Pullman Ex. 65]:

| Plan Funding Sources | |
|---|---|
| New bank Line of Credit | $1,000,000 |
| Excess Cash, Including Sheraton Settlement Proceeds | 1,404,000 |
| Proceeds From Equity Financing | 750,000 |
| Proceeds of Shareholder Loan | 330,000 |
| Total Cash Available | $3,484,000 |

| Cash Payments on the Effective Date | |
|---|---|
| Administrative Expense Escrow | $ 560,000 |
| Priority Tax Claims | 0 |
| Class 1 | 48,000 |
| Class 2 | 0 |
| Class 3 | 0 |
| Class 4 (Including Sheraton Settlement Proceeds of $687,000) | 2,542,000 |
| Class 5 | 131,000 |
| Class 6 | 0 |
| Class 7 | 0 |
| Class 8 | 0 |
| Class 9 | 0 |
| Estimated Cash Payments on the Effective Date | $3,281,000 |
| Cash Available To Fund Operations and Other Plan Payments | $ 203,000 |

*Issues to be Determined*

7. This Court must decide the following issues:

a. What is the allowed amount of Wells Fargo's secured claim, and does the Plan provide Wells Fargo with payments having a present value equal to the allowed amount of its secured claim?

b. Is it proper for the Plan to deduct "Costs to Reorganize"—primarily consisting of pre-petition, unsecured, disputed tax claims and post-petition professional fees—from the aggregate going concern value of Debtors' existing estate prior to determining the allowed amount of Wells Fargo's secured claim?

c. Does the "New Capital" exception to the absolute priority rule still exist, and, if so, does the Plan meet that exception?

d. Does the Plan provide, in accordance with 11 U.S.C. § 1129(a)(7), that Wells Fargo will receive, on account of its allowed secured claim, property of a value that is not less than the amount that Wells Fargo would receive if the Debtors were liquidated under Chapter 7?

e. Do the debtors have a reasonable possibility of a successful reorganization in a reasonable time?

8. The range of Debtors' going concern value argued by the parties is as follows:

a) Creditors' Committee $3,136,000
b) Debtors' range $4,490,000 to $5,663,000 [Pullman Ex. 53]

Debtors contend that the most likely value of the estate is $5,547,000. [Pullman Ex. 49.]

c) Wells Fargo's range $6,626,000 to $7,119,000 [W.F. Ex. 54]

9. The Creditors' Committee ("Committee") contends that the going concern value of Debtors' existing estate, $3,136,000, equals the value of Wells Fargo's secured claim. Debtors contend that the likely going concern value of Debtors' existing estate is $5,547,000, but then compute a deduction for $2,273,000 in "Costs to Reorganize," leaving a value of Wells Fargo's secured claim in the amount of only $3,274,000. The Debtors argue that the "aggregate value of the existing estate is $5,547,000", and that this value is "available to pay administrative and pre-petition priority and secured claims." [Pullman Ex. 49, Note (a).]

10. Wells Fargo contends that the going concern value of the Debtors, and thus its allowed secured claim, ranges from $6,626,000 to $7,119,000. As found hereinbelow, Wells Fargo has a lien on all assets of the Debtors' estate.

11. The Debtors and Wells Fargo both utilized expert witnesses to arrive at their conclusion regarding the aggregate value of the existing estate. The Committee did not utilize its own expert witnesses. It elicited little evidence in support of its contention, but relies on the evidence offered by the other parties. This Court finds hereinbelow that the aggregate value of the Debtors' existing estate, and therefore the amount of Wells Fargo's allowed secured claim, is $5,000,000.

*Wells Fargo Collateral and Claim*

12. Wells Fargo has a first priority, properly perfected security interest in and to all assets of the Debtors, including, without limitation, accounts, accounts receivable, contracts, contract rights, inventory, goods, raw material, work in process, patents, machinery and equipment, vehicles, fixtures, improvements, general intangibles and proceeds thereof (the "Collateral"). [W.F. Ex. 38.] Wells Fargo also has a first priority, properly perfected security interest in, and lien upon, all shares of Stock issued by the Debtors. [W.F. Ex. 38.]

13. On March 9, 1988, the Court granted Wells Fargo a "lien on all assets of the [Debtors] including, but not limited to, their post-petition accounts, contract rights, inventory and their proceeds together with an additional lien on [Debtors'] patent and patent rights." [W.F. Ex. 38.]

14. On August 19, 1988, the Court approved a Settlement Agreement, signed by both Debtors and Wells Fargo, that provided that "Wells Fargo shall have a finally allowed secured claim against the Pullman Companies, and property of the Pullman Companies' bankruptcy estates, in the amount of $8,038,138.95 ..." [W.F. Ex. 44, p. 3, ¶ 6.]

15. Debtors' judicial admission also establishes that Wells Fargo has a properly perfected security interest in, and lien

upon, all pre-petition and post-petition assets of the Debtors. [W.F. Ex. 46, ¶ 2.]

16. Wells Fargo has a lien on all assets of the Debtors' existing estates. [W.F. Exs. 38, 39, 40, 44, 46.]

### The Dispute as to Going Concern Value

17. Debtors and Wells Fargo cannot agree upon the going concern value of Wells Fargo's collateral for purposes of establishing the secured portion of Wells Fargo's allowed claim under 11 U.S.C. § 506(a). Since Wells Fargo has a lien on all of Debtors' assets, Wells Fargo's allowed secured claim is equal to the going concern value of Debtors' assets or estate. The Plan must provide Wells Fargo, on account of its Class 4 secured claim, with payments having a present value equal to the going concern value of Wells Fargo's collateral.

18. The Plan proposes to satisfy Wells Fargo's Class 4 secured claim as follows:

| | | |
|---|---|---|
| a) | $ 732,000 | – representing cash payments/transfers to Wells Fargo. |
| b) | $ 687,000 | – representing the proceeds from the settlement of the "Sheraton Claim." |
| c) | $1,855,000 | – cash payment upon confirmation. |

**TOTAL $3,274,000**  [Pullman Ex. 63]

The factual issue to be resolved is this: Whether the Debtors' proposed $1,855,000 cash payment at confirmation, or the lesser amount suggested by the Committee, is equal to the going concern value of Wells Fargo's presently existing collateral? For reasons stated below, the Court finds that the answer is no.

19. This Court previously has found as of the Petition Date that the forced liquidation value of Debtors' cash, accounts receivable, machinery and equipment and inventory was $3,182,500. [W.F. Exs. 38, 39.] However, this Court has not previously determined the going concern value of Wells Fargo's collateral.

### Book Value of Debtors' Assets

20. As of June 30, 1989, the book value of Debtor's assets were:

| | |
|---|---|
| Cash and Excess Cash | $1,117,000 |
| Net Construction Receivables (excluding the Sheraton receivables) | 3,250,000 |
| Inventory | 465,000 |
| Other Current Assets | 366,000 |
| Fixed Assets (Net) | 601,000 |
| Other Assets | 102,000 |
| **TOTAL OF ALL ASSETS** | **$5,901,000** |

[Pullman Ex. 64.]

### Theories and Evidence as to Valuation

■ 21. Pullman's going concern valuation expert witnesses relied primarily upon a discounted cash flow analysis and have concluded that the appropriate discount rate for Pullman is 18 percent. In reaching this conclusion they employed numerous valuation models and techniques to determine the appropriate discount rate, including: (i) Capital Asset Pricing Model ("CAPM") alternatives; (ii) weighted average cost of capital analyses, (iii) arbitrage pricing theory, and (iv) a survey of selected current investment yields. As additional confirming measures for their valuation results, they also reviewed price/earnings comparisons, earnings before interest and taxes ("EBIT") comparisons, earnings before depreciation, interest and taxes ("EBDIT") comparisons, book value comparisons and dividend capitalization model analyses. They agreed on an 18 percent discount rate which, when applied to the anticipated future cash flows set forth in Pullman's Business Plan, produces what they found to be the most likely net present value of Pullman's future cash flows. This is one component of Pullman's aggregate reorganization value, the other being excess cash or non-operative assets.[6]

| | |
|---|---|
| Net Future Value of Cash Flows | $3,411,000 |
| Value Transferred to Bank During Ch. 11 | 732,000 |
| Excess Cash ($717,000 plus $687,000) | 1,404,000 |
| | $5,547,000 |

---

6. "Pullman's Aggregate Estate" was said to mean the combined value of: (i) Pullman's net future cash flows; (ii) property transferred to the Bank during the Chapter 11 cases; and (iii) Pullman's excess cash on the Effective Date, including the Sheraton settlement proceeds. The most likely aggregate value of Pullman's estate is said by Debtor's to be $5,547,000, calculated as follows (Pullman Ex. 49):

22. Pullman's expert witnesses on this issue were Harold W. Sullivan, Jr. of Ernst & Whinney and Dr. Robert S. Hamada. Mr. Sullivan utilized the CAPM as well as several other valuation methodologies discussed hereinbelow, while Dr. Hamada used only his refinement of the CAPM approach to validate and corroborate Ernst & Whinney's conclusion that Pullman's cost of capital, or the property discount rate, is eighteen percent (18%).

23. Harold Sullivan of Ernst & Whinney testified on behalf of the Debtors that the "most likely value" of the Debtors' "present value of free cash flows," based on his use of a discounted cash flow analysis, is $3,411,000. [Pullman Ex. 45.] This analysis was based upon an 18% discount rate. [Pullman Ex. 45.] The $3,411,000 net present value of free cash flows excluded consideration of $2,136,000 of "Non–Operating Items". [Pullman Ex. 49.]

24. To calculate the most likely aggregate value of the Debtors' estate, Mr. Sullivan added "Non–Operating Items" totalling $2,136,000 to his most likely net present value of free cash flows of $3,411,-000. [Pullman Ex. 49.] Mr. Sullivan then concluded that the most likely aggregate value of Debtors' existing estate is $5,547,-000. [Pullman Ex. 49.] This is the value "available to pay administrative and pre-petition priority and secured claims." [*Id.* at Note (a).]

25. Professor Alfred Rappaport defines "corporate value" as the sum of "present value of cash flow from operations during the forecast period plus residual value plus marketable securities." [Pullman Ex. 89, p. 51.] This definition was essentially followed by experts for both sides. Debtors claim corporate value of $5,547,000 comports with this definition as follows: (a) present value of cash flow from operations during the forecast period—$1,354,000, [Pullman Ex. 45, (present value of free cash flows 1989 through 1993)]; plus, (b) residual value—$2,057,000, [Pullman Ex. 45 (present value of free cash flows after forecast period)]; plus, (c) marketable securi-

ties—$2,136,000 [Pullman Ex. 49 (non-operating items)]. Mr. Sullivan testified that these items have a strong or identical correlation to Professor Rappaport's definition of corporate value. [Tr. pp. 107–110, 6/5/89.]

26. The following is a discussion of each of the valuation approaches utilized by Debtors' witnesses to determine the most likely value of Pullman's Aggregate Estate.

### a. *Discounted Cash Flow*

The discounted cash flow method presents value as the sum of a stream of free cash flows from the Plan's Effective Date into perpetuity. The present value of the cash flows is dependent on the time value of money and the risk of producing the projected cash flows. The projected cash flows are based on Pullman's Business Plan. Those cash flows include both the projection period through 1993 and the perpetuity period beginning in 1994. Pullman's experts prepared detailed projections through 1993 because they assumed that by that time Pullman would regain its historical market share and achieve its growth projections. It is found below that if Debtor were reorganized in 1989, they would gain their maximum market share by 1993. After that, they will be unable to grow further in value because of the competitive nature of the construction industry and the historical inverse relationship between Debtors' revenues and margins. The evidence does not demonstrate that Pullman can make additional investments after 1993 that will generate returns in excess of its cost of capital.

After gaining its maximum market share, Pullman will not experience further economic growth, even though it may grow in size. The addition of years of projections after 1993 does not demonstrate any real value for purposes of a present valuation. Instead, the residual value of Pullman's cash flows from 1994 into perpetuity

can be determined by the perpetuity method. As Dr. Rappaport explained it,

Using the perpetuity method, the present value (at the end of the forecast period) is therefore calculated by dividing a "perpetuity cash flow" by the cost of capital:

$$\text{Residual value} = \frac{\text{Perpetuity cash flow}}{\text{Cost of capital}}$$

Keep in mind that the perpetuity method for estimating residual value is not based on the assumption that all future cash flows will actually be identical. It simply reflects the fact that the cash flows resulting from future investments will not affect the value of the firm because the overall rate of return earned on those investments is equal to the cost of capital.

[Pullman Ex. 89, p. 61]

Pullman's value is properly calculated discounting each projected annual cash flow through 1993 by the cost of capital and calculating the value of the cash flows thereafter by the perpetuity method as described by Dr. Rappaport.

Once the annual cash flows have been projected, the other important component to be determined is Pullman's cost of capital or discount rate. Pullman's experts utilized several methodologies in forming their opinion as to the appropriate discount rate. These methods, which rely in varying degrees upon analyses of publicly-held companies in the construction industry are:

*Arbitrage Pricing Theory ("APT")* —This is a multi-variable model which estimates cost of capital based on the performance of identified stocks relative to the market as a whole and to selected other stock portfolios. [Pullman Ex. 34.] The APT formulation uses the following portfolios in addition to the market portfolio.

—Large Capitalization Stocks
—Small Capitalization Stocks
—High Cash Flow/Price Stocks
—Low Cash Flow/Price Stocks

*Capital Asset Pricing Model ("CAPM")* —The CAPM methodology measures a company's risk relative to the stock market as a whole. Risk is measured as the variability of a stock price relative to a market portfolio. The average historical annual premium of an investment in the market portfolio relative to an investment in an estimated risk-free instrument is adjusted by the variability of the individual stock price relative to the market portfolio (*i.e.,* an estimate of the riskiness of the particular stock or its "beta"). This estimate is added to the current risk-free rate to estimate the rate of return an investor would require on such an investment.

Here, an equally weighted New York Stock Exchange portfolio was analyzed as the "market portfolio" in order better to reflect the performance of both smaller and larger publicly-held companies. A value weighted portfolio (the S & P 500) was also analyzed and adjusted for a small stock premium. The use of CAPM methodology is described below.

*Weighted Average Cost of Capital ("WACC")* —WACC is the weighted average of the after-tax cost of debt (*i.e.,* the marginal rate at which a company can borrow funds) and the company's cost of equity. The cost of debt is tax-effected because of the tax deductions associated with interest payments. Cost of equity has been based on analysis of potential peer companies. The costs are weighted respectively by the ratios of the market values of debt and equity to the market value of total capital (debt plus equity) to derive a weighted average. The results were very similar to those obtained using CAPM methodology. [Pullman Ex. 39, 44.]

*Survey of Alternative Investments* —A survey of alternative investments currently available in today's market, evidencing rates of return currently expected by investors, was also made to determine Pullman's cost of capital. [Pullman Ex. 32, 33, 34.]

b. *Peer Group Multiple Analyses*

In order to confirm their discounted cash flow valuation findings, Pullman's experts analyzed certain multiples of financial data for other companies. Although this analysis was not performed in the same depth as the discounted cash flow analysis, and it is not entitled to the same weight because of its reliance on accounting-based numbers,

it serves to corroborate results of the cash flow analysis. This multiple analysis, which was performed on publicly-held companies in the construction industry, included:

*Price–Earnings Multiple ("P/E")* —"Earnings" is defined as operating earnings after taxes. The respective median P/E multiples for the Peer Group were estimated to be 11.79 and 9.86. These multiples were applied to Pullman's actual 1988 and projected 1989 operating earnings to calculate a range of potential values. [Pullman Ex. 54.]

*EBIT Multiple* —"EBIT" is earnings before interest and taxes. The median Peer Group EBIT multiple was estimated to be 6.06. This multiple was applied to PCI's 1988 actual earnings before interest and taxes to calculate a potential value. [Pullman Ex. 56.]

*EBDIT Multiple* —"EBDIT" is earnings before depreciation, interest and taxes. The median EBDIT multiple for the Peer Group was 5.03. This multiple was applied to PCI's 1988 earnings before depreciation, interest and taxes to calculate a potential value. [Pullman Ex. 57.]

*Book Value Multiple* —Book value is the excess of the net book value of the assets over the net book value of the liabilities (*i.e.*, stockholder's equity). The Peer Group companies' median book value multiple was estimated to be 1.38. Pullman's net book value was calculated both before and after the new equity investments, and those figures were multiplied by the median book value multiple to estimate potential values. [Pullman Ex. 59, 60.]

All of these multiple analyses were adjusted by reconciling items to make estimates of Pullman's gross reorganization value.

### c. Dividend Capitalization

Another confirming technique employed was the dividend capitalization model, which assumes that dividends are a constant stream of cash flows to equity investors. The present value of a stream of equal cash flows, or an annuity, is the cash flow divided by the discount rate. The discount rate is calculated as described above in the Discounted Cash Flow Approach Summary. Items were added to this calculated value to reconcile to the reorganization value. [Pullman Ex. 58.]

### d. The Synthesis of the Various Techniques Used

In addition to these confirming techniques, Pullman's experts considered certain other factors, including the following: (i) Pullman is privately-held and does not have access to public capital markets; (ii) achieving the Business Plan's objectives is dependent on the continued involvement of a few key managers; (iii) Pullman has been in bankruptcy; (iv) the construction industry is very dependent upon personal relationships and a substantial portion of Pullman's good will and value resides in the Goldwyns; and (v) Pullman operates in a single localized market, not a regional or national market. Finally, Pullman's experts weighed the strengths and weaknesses of each of the methodologies employed in forming their opinions that 18% is the appropriate discount rate and that the most likely gross value of Pullman's aggregate estate is $5,547,000.

Application of the various confirming techniques produced the following range of values of Pullman's Aggregate Estate [Pullman Ex. 53]:

| | |
|---|---|
| Price/Earnings Multiple on Forecasted 1989 Earnings | $4,490,000 |
| Book Value Multiple Before New Equity Investment | $4,693,000 |
| Dividend Capitalization Model | $4,803,000 |
| Price/Earnings Multiple on EBIT | $4,815,000 |
| Price/Earnings Multiple on EBDIT | $4,882,000 |
| Book Value Multiple After New Equity Investment | $5,390,000 |
| Price/Earnings Multiple on Pre-Confirmation 1988 Earnings | $5,663,000 |

*CAPM Methodology*

The principal technique employed by both Ernst & Whinney and Dr. Hamada to determine the discount rate was CAPM. CAPM methodology recognizes that different investments have different levels of risk and, therefore, should produce different returns to investors. The CAPM method measures the risk associated with a

specific investment relative to the risk of a portfolio of investments, and prices or values that investment relative to the return on the portfolio. The general CAPM cost of capital equation is summarized as follows:

$$R(c) = R(f) + B(a) \times [R(m) - R(f)]$$

where

$R(c)$ = the CAPM cost of capital
$R(f)$ = the after-tax risk-free rate of return
$B(a)$ = the beta, or risk, of the asset
$R(m)$ = the return on the market portfolio
$R(m) - R(f)$ = the market risk premium

The derivation of each of the components of the CAPM equation used in calculating Pullman's cost of capital is as follows:

The after-tax risk-free rate of return is first calculated. This is the rate of return an investor could expect to receive by investing in a risk-free asset, after paying taxes on the investor's return. One year Treasury Bills, backed by the full faith and credit of the United States Government, are generally considered to be the best proxy for the risk-free rate. Pullman's before-tax risk-free rate was assumed to be equal to the yield, as of April 11, 1989, on one-year Treasury Bills due April 12, 1990. That rate is 9.72 percent. Using the same forty percent (40%) assumed corporate tax rate that was used in developing the "free cash flows" in Pullman's Business Plan and Projected Financial Statements, the after-tax risk-free rate was calculated as follows [Pullman Ex. 38]:

| | |
|---|---|
| Before-tax risk-free rate | 9.72% |
| Less: Taxes at 40% | (3.89%) |
| After-tax risk-free rate | 5.83% |

The "beta" coefficient measures the risk of an investment in Pullman's business relative to the risk of the market as a whole. *See In re Jartran, Inc.*, 44 B.R. 331, 370 (Bankr.N.D.Ill.1984), citing *In re The Valuation Proceedings Under Sections 303(c) and 306 of the Regional Rail Reorganization Act of 1973*, 531 F.Supp. 1191, 1233 (Regional Rail Reorg.Ct.1981) ("Valuation Proceedings"). Since Pullman is not publicly traded, it is impossible to measure changes in the return on Pullman's common stock over time against a portfolio of market securities. Accordingly, a group of publicly-traded companies in the construction industry was selected in order to measure the risk of the special trade contracting industry against the risk of the entire market. This group of companies was used as Pullman's "Peer Group." These comparable publicly-traded companies were selected through an analysis of publicly-traded companies in the special trade contracting and non-residential general contracting businesses.

Using the Alcar database and the COMPACT Disclosure database, Ernst & Whinney initially identified 108 publicly-traded companies having either primary or secondary business lines within Standard Industrial Codes in the 1,700 series ("Special Trade Contractors") or 1,540 series ("Non–Residential Building Contractors"). Ninety of these companies were excluded as potential peers because they were not deemed to be comparable to Pullman. The reasons for exclusion were as follows [Pullman Ex. 40]:

—Certain companies were excluded because their primary SIC Code was not in the 1,540 or 1,700 series;

—Certain companies were excluded because their lines of business are not comparable to Pullman's business;

—Certain companies were excluded because they were in bankruptcy proceedings at sometime during 1985–1987;

—Certain companies were excluded because they operate primarily outside of the United States;

—One company was excluded because it was privately held until August, 1987;

—Certain companies were excluded because of thin trading of their securities on regional stock markets; and

—Certain companies were excluded because their beta coefficient was not statistically significant.

After these exclusions, the following eighteen companies formed Pullman's "Peer Group" [Pullman Ex. 41]:

Abrams Industries
Acmat
Apogee Enterprises
Comstock Group
Fischback
GMX
CH Heist
Insituform East
Insituform Gulf South
Insituform Southeast
JWP
LVI Group
Maxco
MMR Holding
Morrison Knudsen
Perini
Turner
Williams Industries

The eighteen companies making up the Peer Group were then further analyzed and divided into three separate "Cases." Case I includes all eighteen companies in the Peer Group; Case II includes only eleven companies in the Peer Group; and Case III includes sixteen of the original eighteen companies in the Peer Group. Two deletions were made from the Case I companies to arrive at the Case III group of companies. One company was deleted because it provided maintenance services only, a business line markedly different than Pullman's. The other company was excluded because it had significant units in the business of manufacturing and distributing auto parts, auto paints and industrial supplies. [Pullman Ex. 42.]

Beta statistics for each company in the Peer Group were calculated by Ernst & Whinney, utilizing a linear regression technique. The linear regression methodology calculates the relationship between monthly returns on the peer company stock and monthly returns on a weighted New York Stock Exchange portfolio of stocks during the period January, 1983 through December, 1987. [Pullman Ex. 41.] A calculated beta of 1.0 generally indicates that the volatility or risk of an investment in a stock is equal to the volatility or risk of the market as a whole; that is, a one percent change in the value of the market portfolio is accompanied by a one percent change in the value of the stock. Betas above 1.0 indicate stocks that are more volatile (risky) than the market, while betas less than 1.0 indicate stocks that are less volatile (risky).

The betas calculated by this linear regression method for all Peer Group companies are equity or stock betas, which measure the risk of an investment in the equity of a company. Such equity returns are affected by the level of debt, or leverage, that the company carries. In order to estimate the risk of the *business* rather than the risk of an investment in the *equity* of the business, an asset beta is calculated which adjusts to eliminate the financial risk of leverage. The asset beta for each Peer Group company was calculated from its equity beta, using the following formula (referred to as "unlevering the beta") [Pullman Ex. 39, 41]:

$$\text{beta(a)} = [\text{beta(d)} \times (1 - \text{Tc}) \times (\text{D/V})] = [\text{beta(e)} \times (\text{E/V})]$$

where

beta(a) = asset beta
beta(e) = beta of the company's equity, as calculated
beta(d) = beta of the company's debt, assumed to be .195
E = Market value of equity
D = Market value of debt
V = Market value of capital (<u>i.e.</u>, D + E)

The appropriate market values of debt and equity for the above equation were estimated as follows:

—The market value of debt was derived from an analysis of the 10–K annual reports filed by each Peer Group company and a survey of Moody's Bond Record to obtain prices on publicly-traded debt.

—The market value of equity was derived by extending the number of shares outstanding by the share price derived from the Wall Street Journal and/or public databases.

—The debt/capital and equity/capital ratios were calculated for each of the peer company's three fiscal years ending before June 39, 1988 (where market information for all three years was available).

—The average of the debt/capital and debt/equity ratios calculated for each year was used in the equation to "unlever" the beta.

Once the asset betas were calculated for each Peer Group company, the Peer Group asset beta was calculated as the average of the asset betas for each company in the Peer Group. [Pullman Ex. 42.]

Next, the market risk premium was calculated. This is defined as the premium which investors demand over the risk-free rate in order to compensate them for investments in common stock. The market risk premium for the stock market as a whole was calculated as follows [Pullman Ex. 38]:

—The Center for Research in Security Prices ("CRSP") calculates a monthly equal-weighted market return on the New York Stock Exchange portfolio of securities for each month from 1926 through 1987. These monthly NYSE portfolio returns were downloaded from CRSP by Ernst & Whinney, and comparable annual returns were calculated from these monthly returns.

—The average monthly return on Treasury Bills was also downloaded from the CRSP database. Comparable annual returns were calculated from these monthly returns. The top marginal tax rate in each year from 1926 through 1987 was applied to the calculated annual Treasury Bill returns to determine the after-tax return on Treasury Bills, *i.e.*, the after-tax risk-free rate.

—The market risk premium between the equal weighted NYSE portfolio and the after-tax risk-free rate was calculated by Ernst & Whinney for each year from 1926 to 1987. The average of these annual premiums, 14.98% was used as the market risk premium in the CAPM equation.

The CAPM cost of capital for each of the three Cases was calculated using the risk-free rate (5.83%), the market risk-premium (14.98%) and the applicable asset betas (.80 for Case I, .85 for Case II, and .82 for Case III) as follows [Pullman Ex. 43]:

|  | CASE I | CASE II | CASE III |
|---|---|---|---|
| After–Tax Market Risk Premium | 14.98% | 14.98% | 14.98% |
| Peer Group Asset Beta | 0.80 | 0.85 | 0.82 |
|  | 11.94% | 12.72% | 12.24% |
| Add: After–Tax Risk–Free Rate | 5.83% | 5.83% | 5.83% |
| Derived Discount Rate | 17.77% | 18.55% | 18.07% |

Pullman and Wells Fargo experts concluded that 18% is the proper rate applicable here.

### The Creditors Committee Argument as to Discount Rate

The Creditor's Committee offered no expert witnesses of its own. However, from the evidence it argued that the 18% discount rate used in calculations by the experts of Cash Flow Value is overly optimistic, asserting that they failed to account for particular risks unique to an investment in Pullman. Debtors' experts calculated the beta coefficient for Debtors' business, which is essentially a measure of the risk associated with an investment in that business relative to the risk of the market as a whole. "Beta measures the amount of risk which a stock contributes to a portfolio made up a large number of stocks." *Valuation Proceedings*, 531 F.Supp. at 1233. It does not, however, measure certain risks of a stock held in isolation, viz., those risks associated with events unique to the particular business. As indicated by the court in *Valuation Proceedings*, these special risks must be given consideration. There, the court held that the following three factors must be considered in estimating cost of equity: (i) the rate of return demanded by investors in average risk stocks; (ii) the riskiness of stocks in the particular industry relative to average-risk stocks; and (iii) the riskiness of an equity investment in the particular company under consideration relative to the industry as a whole. *Id.* at 1232. *See also In re Muskegon Motor Specialties*, 366 F.2d 522, 528 (6th Cir.1966) (court would not sanction direct application of ratios derived solely from the stock market in the valuation of a small, unlisted company with no market for its shares).

Thus the Committee argues that the analyses performed by Debtors' experts do not sufficiently account for the special risks unique to an investment in Pullman. Accordingly, the Committee asks this Court to in find the discount rate to be 20% so as to account for these special risks.

However, the weight of evidence does not support the Committee's argument that the discount rate should be raised to 20%, leading to a $367,000 loss in value. Debtors introduced considerable evidence to support their conclusion that 18% is an appropriate cost of capital (discount rate). Mr. Sullivan testified to his extensive effort to calculate the discount rate. Dr. Hamada, a professor from the University of Chicago, reviewed the calculations and concurred with Mr. Sullivan's conclusion in this regard. Professionals from the firm of Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan, Lokey") reviewed Ernst & Whinney's work-papers, and also concurred with Mr. Sullivan's conclusion. The conclusion that 18% is an appropriate cost of capital (discount rate) was the opinion of each expert who testified. The Committee suggests that the "analysis performed by debtors' experts do not sufficiently account for the special risks to Pullman". [Committee, Post–Trial Findings at 5.] While there is some weight to that argument, the weight of evidence supports a finding of an 18% rate. The evidence also establishes that the actual insider investors in this case are expecting to receive a rate of return on their investment substantially below 18%. [Pullman Ex. 71.] Debtors contend that the actual rate of return on the new equity investment is 8.42%. Finally, Mr. Sullivan testified that the use of current Treasury Bill rates would have lowered the Cost of Capital conclusions set forth in Pullman Ex. 43 to 17.47%, 18.25% and 17.77%. [Tr. P. 124, 6/5/89.] Therefore, based upon all the evidence and the actual existing investors, as opposed to hypothetical market investors, Pullman's discount rate, or cost of capital, is found to be 18%. The weight of evidence does not support raising the discount rate to 20%.

### The Evidence and Theories of Wells Fargo

27. Richard P. Bail, a principal with the firm of Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan, Lokey"), testified on behalf of Wells Fargo regarding the going concern value of Debtors' existing estate. Mr. Bail and Houlihan, Lokey have conducted numerous business and asset valuations, representing lenders, sellers and buyers. Mr. Bail utilized several valuation techniques, including a discounted cash flow method, for the purpose of valuing Debtors' assets.

28. Houlihan, Lokey's discounted cash flow analysis relied upon the factual assumptions contained in Debtors' Business Plan. [Pullman Ex. 3.] Houlihan, Lokey reviewed the Business Plan, Ernst & Whinney's work papers and other public information regarding Pullman. Dr. Hamada concurred in the 18% discount rate figure. Houlihan, Lokey concluded that the 18% discount rate utilized by Ernst & Whinney was appropriate. Houlihan, Lokey also concluded that Ernst & Whinney's revenue assumptions and gross margin assumptions were appropriate. Both Ernst & Whinney and Houlihan, Lokey are experienced financial consultants.

29. Houlihan, Lokey's report asserts that there are several major flaws in Debtors' discounted cash flow analysis. First, it argues that Debtors failed to recognize any interest income on Debtors' operating cash balance of $400,000. Harold Sullivan, at deposition and at trial, recognized that

economic benefit could be obtained from the operating cash. [Tr. pp. 137, 138, 6/5/89.] Houlihan, Lokey concluded that appropriate treatment of operating cash would yield an increase in reorganization value ranging from $0 to $150,000, with $80,000 being the reasonable estimate of increase in value. [W.F. Ex. 54.]

30. Second, they argue that Debtors' analysis utilizes a "Perpetuity Multiple" of 5.6 to calculate the value of cash flows to be generated after the year 1993. [Pullman Ex. 45.] A 5.6. perpetuity multiple assumes zero real revenue growth, and, therefore, no additional net present value growth, after 1993. [W.F. Ex. 54.] Based upon its experience and review of market date, Houlihan, Lokey believes it is improper to utilize a Perpetuity Multiple of 5.6. Houlihan, Lokey believed that an appropriate rate of "Perpetuity Multiples" is as follows:

| | A | B | C | D |
|---|---|---|---|---|
| Assumed Long–Term Growth Rate | 4% | 6% | 8% | 10% |
| Reviewed Perpetuity Multiple | 7.4 | 8.8 | 10.8 | 13.8 |

The revised Perpetuity Multiple would yield a range of increased reorganization values, depending upon which "Perpetuity Multiple" is chosen, as follows:

| | A | B | C | D |
|---|---|---|---|---|
| Increased Reorganization Value | $481,000 | $999,000 | $1,740,000 | $2,852,000 |

Houlihan, Lokey concluded that the most appropriate Perpetuity Multiple would be 8.8. This would yield an increase to reorganization value of $999,000. [W.F. Ex. 54.]

31. Wells Fargo argues that Debtors' calculation of the net present value of free cash flows is underestimated, because the Perpetuity Multiple used by Debtors to calculate cash flows in perpetuity (5.6) assumes that there is no new investment in working capital after 1993 and that

projects after 1993 will add zero net present value to the business.

32. While Debtors assume that after January 1, 1994, the present value of Debtors will cease to increase, the Bank argues that Pullman's business will have real revenue growth beginning in 1994. First, they suggest that the business has grown substantially under the stewardship of Lester Goldwyn, and Lester Goldwyn will stay active on a full-time basis through 1993, and then will gradually wind-down his involvement with the business. Second, the

business will gradually be turned over to John Goldwyn, Lester's son. John Goldwyn appears extremely able, bright, energetic and ambitious. With the assistance his father has promised to provide even after he begins to limit his involvement in Pullman, and given John Goldwyn's desire to turn the business over to his son, the Bank suggested at trial that the business would continue to grow in 1994. Since the trial concluded, both Lester Goldwyn and John Goldwyn have resigned from the Company, rendering those optimistic views entirely moot.

33. Houlihan, Lokey concluded that the going concern value of Well's Fargo's collateral, utilizing a discounted cash flow analysis and before addition of Non-Operating Items, is as follows:

| | |
|---|---|
| Debtors' Calculation of the Net Present Value of Free Cash Flows | $3,411,000 |
| Plus: Present Value of Interest Income | 80,000 |
| Plus: Value of revised Perpetuity Multiple | 999,000 |
| Adjusted Net Present Value of Free Cash Flows | $4,490,000 |

[W.F. Ex. 54; Test. of R. Bail.] In order to enable the Court to readily and easily compare the dispute between the parties, Houlihan, Lokey then added certain "Non-Operating Items" to the net present value of Debtors' free cash flows. These Non-Operating Items are identical to those added by Debtors' consultants in Pullman Ex. 49 in arriving at their most likely aggregate value of Debtors' existing estate, except for Houlihan, Lokey's inclusion of post-petition retainers paid to professionals that have not yet been allowed by Court order (denominated "Funds Held by Professionals in Trust"). The "Non-Operating Items" are:

| | |
|---|---|
| Excess Cash Balance Before Reorganization Adjustments | $ 717,000 |
| Cash Payments/Asset Transfers to Wells Fargo through June 30, 1989 | 732,000 |
| Proceeds from Sheraton Claim Settlement | 687,000 |
| Funds Held by Professionals in Trust | 493,000 |
| TOTAL NON-OPERATING ITEMS | $2,629,000 |

Houlihan, Lokey thus concluded that the total going concern value of Debtors' existing estate, as of June 30, 1989, is $7,119,-000. If Houlihan, Lokey were to exclude post-petition retainers, as did Debtors and the Committee, its conclusion as to the going concern value of Debtors' existing estate would be $6,626,000. Thus, based upon a discounted cash flow analysis, Houlihan, Lokey concluded that the going concern value of Debtors' existing estate ranges from $6,626,000 to $7,119,000.

34. The third asserted flaw cited by Houlihan, Lokey in Debtors' analysis involved the data used in certain alternative valuation techniques employed by both Houlihan, Lokey and Debtors' consultants to test their respective discounted cash flow analysis. Three general methods of appraisal may be used to value the assets involved here. The income approach; the cost approach; and, the market approach. A discounted cash flow analysis equates to an income approach. A book value analysis equates to a cost approach. The alternative valuation techniques utilized by Ernst & Whinney and Houlihan, Lokey are said by Wells Fargo to be analogous to a market approach. These included a price to EBIT (Earnings before Interest and Taxes) technique and a price to EBDIT (Earnings before Depreciation, Interest and Taxes) technique. These techniques are referred to as "market multiple" approaches. These market multiples approaches were applied in an identical manner and fashion to the market multiple approaches utilized by Debtors' consultants, and they were applied to the same asserted "peer group" of companies used by Debtors' consultants. Houlihan, Lokey, claimed to have used the proper and commonly accepted formula for their calculations. Debtors' consultants utilized a formula that excluded the market value of debt, said by Wells Fargo to be an essential element of the valuation ratio. By utilizing Ernst & Whinney's numbers and by including the market value of debt as required, Houlihan, Lokey concluded that Ernst & Whinney's conclusions were virtually identical to Houlihan, Lokey's conclusions. Houlihan, Lokey's valuation techniques resulted in a valuation range as follows:

| | |
|---|---|
| Discounted Cash Flow excluding retainers | $6,626,000 |
| Price/EBIT Approach | $6,733,000 |
| Price/EBDIT Approach | $7,023,000 |
| Discounted Cash Flow including retainers | $7,119,000 |

[W.F. Ex. 54.] The alternative valuation techniques likewise are said to have validated Houlihan, Lokey's conclusion that

Ernst & Whinney's 5.6 perpetuity multiple, which assumes zero net present value growth after 1993, improperly understates value. The average of Houlihan, Lokey's valuation methodologies is $6,875,250.

35. *Analysis of the Bank's Arguments on Valuation*

The Bank argued that selected assumptions in Pullman's Business Plan should be modified so that Pullman's value, and thus the value of the Bank's Class 4 Claim, should be increased. Its argument is, however, flawed.

(a) *The Bank's Lack of In–Depth Analysis*

First, neither the Bank nor its expert offered any independent analysis of the value of Pullman's business. Instead, the Bank had its expert rely heavily upon Ernst & Whinney's work but selectively alter certain Business Plan assumptions. Neither the Bank nor its expert spent any time with Pullman's management discussing the assumptions underlying the Business Plan.

(b) *The Unsupported Infinite Growth Assumption*

■ The Bank's expert, Richard Bail, testified that the value of Pullman's business is $4,410,000, rather than the $3,411,-000 calculated by Ernst & Whinney. This increased value results primarily from Mr. Bail's assumption that Pullman will sustain annual growth of 2 percent in real terms, or 6 percent in nominal terms, indefinitely after 1993 and his calculation that the value impact of such growth is $999,000. Mr. Bail is mistaken in both respects.

The Bank's assumption of indefinite 2% annual growth is not supportable. It arises from Mr. Bail's use of the peer group of publicly-held companies identified by Ernst & Whinney for the limited purpose of determining the inherent business risk for Pullman's type of business. The Bank, however, attempts to extrapolate from the growth characteristics of those companies to Pullman. This is not an appropriate method to project economic growth. Growth is company specific and

cannot logically be imputed from one company to another, particularly in a competitive industry such as construction. Growth should be reflected in a company's cash flows based upon those specific products or services that will allow the company to earn in excess of its cost of capital. The Bank's experts did not identify those products Pullman would offer after 1993 that could allow it to sustain real growth. Rather, they assumed for Pullman the growth rate expected for certain of the "peer group" companies. While the "peer group" is the closest approximation available of analogous businesses for purposes of computing a capital discount rate, its usefulness in predicting future growth of Debtors' business is doubtful.

Even if the expected growth of other companies could be imputed to Pullman, the Bank's basis for implying growth for Pullman's peer group is unsound. The Bank used market capitalization ratios for the peer group, took the median of the positive ratios, and applied a formula known as the Gordon Growth Model to determine an adjusted perpetuity discount rate. This approach reflects a substantial selective bias in the following: (i) use of the publicly-traded peer group of mainly national companies to establish growth characteristics for the entire industry, much of which, like Pullman, is privately held and operated in a local market; (ii) use of the median ratios for Pullman, rather than some lesser position on the range of ratios more appropriate for Pullman's relative financial and competitive position; and (iii) the calculation of those median ratios based upon only the positive ratios of the peer group.

The use of the median ratios is not an appropriate indicator of growth rates for another company. As an example, when the Bank's Gordon Growth Model methodology is applied to the specific peer company associated with those median values, Abrams Industries, the results using Abrams' cost of capital imply that it is undergoing real shrinkage, not real growth. When other peer companies with high ratios are analyzed, the growth re-

flected is accounted for by such idiosyncratic factors as an aggressive acquisition program, record backlog level, or recent substantial contract awards. None of those factors are projected for Pullman during the perpetuity period.

In addition, the market capitalization ratios themselves have two serious shortcomings. Mr. Bail computed them using different dates to determine the levels of debt and equity and stock prices. [Pullman Ex. 131.] This tends to distort the results; for example, additional borrowing between the date of reported earnings and the date used for stock prices are misleadingly reflected as positive growth because they increase total capital. When recomputed correctly using the same dates for all the data, the ratios indicate valuation amounts close to the level determined by Pullman's experts. [Pullman Ex. 132, 133, 134.]

Use of market capitalization ratios is also not preferred because they are based upon earnings figures which are accounting-based numbers and may not be accurate for cash flow purposes. Despite its heavy reliance upon accounting numbers for projecting growth, the Bank undertook no analysis and adjustment for them for such deficiencies as differences in accounting conventions for depreciation, inventory, pension obligations, and health benefit costs, as well as their failure to take into account need for additional capital expenditures, reinvestments in working capital, dividend policies, and business risks. Lack of adequate financial information for the peer group companies makes it impossible to determine realistically whether adjustments are appropriate. This detracts from weight to be given to the Bank's analysis.

The Bank's use of the Gordon Growth model is also inappropriate to project growth for Pullman. This model, also referred to as the Dividend Discount Model, was formulated to forecast the prices of publicly traded stocks assuming that dividends grew at a constant rate into perpetuity. Not only is the model subject to several restrictive assumptions which are not satisfied by Pullman, but it also ignores the highly competitive nature of Pullman's business and fails to identify any source of growth for Pullman after 1993.

Well-recognized authority on corporate finance also indicates that the Bank's infinite growth assumption is inappropriate and that Pullman's experts' view of Pullman's residual value is correct:

> The perpetuity method for estimating residual value is based on the foregoing competitive dynamics. It is essentially based on the assumption that a company that is able to generate returns above the cost of capital (i.e., achieve excess returns) will eventually attract competitors, whose entry into the business will drive returns down to the minimum acceptable or cost of capital rate. Specifically, the perpetuity method assumes that after the forecast period, the business will earn, on average, the cost of capital on new investments. Another way of expressing this idea is to say that after the forecast period, the business will invest, on average, in strategies whose net present value is zero.

*Rappaport, supra,* at 60–61.

(c) *The Overstated Effect of Infinite Growth*

The Bank's forecast of 2 percent annual real growth for Pullman is not only unsupported, but it greatly overstates the value impact of that growth. The Bank contends that, assuming 2 percent annual real growth, or 6 percent nominal growth, the present value of Pullman should be $999,000 higher. The Bank calculates this amount by increasing by 6 percent annually the Normalized Operating Profit After Taxes ("NOPAT") figure of $718,000 used by Ernst & Whinney to estimate Pullman's perpetuity value. However, the Bank failed to take into account that the NOPAT figure is an approximation which excludes any increases in working capital or capital expenditures that are necessary for real growth and that NOPAT already includes the effect of projected inflation of 4 percent. The NOPAT approximation assumes that Pullman will generate $718,000 annually form 1994 into perpetuity, which must be compared to the detailed cash flow projected by Ernst & Whinney for 1993 of

$318,000. Those cash flows with revenues, expenses and reinvestments grown each year into perpetuity by the 4 percent projected inflation, is what the constant NOPAT figure is intended to represent. Each method of estimating Pullman's residual value has approximately the same present value. [Pullman Ex. 129.] (Transcript of June 6, 1989, pp. 112–113.)

By applying its 6 percent nominal growth assumption to the NOPAT approximation, instead of to the detailed cash flow figures, the Bank more than tripled the value impact of the assumed growth. The actual value added by 2 percent residual real growth is $320,000 instead of $999,000. The $679,000 difference is a calculation error. [Pullman Ex. 130.]

#### (d) *The Interest Assumption*

The Bank also contends that Pullman will have additional value of $80,000 because its working capital of $400,000 will be available to earn interest. This contention ignores the fact that Pullman's proposed borrowing arrangement with South Chicago Savings Bank requires Pullman to maintain a "compensating balance" of $150,000 in an account which does not bear interest. In addition, Pullman is unlikely to have any significant cash balances available to earn interest because the working capital will be tied up in other current assets, particularly accounts receivable and costs and earnings in excess of billings. Ernst & Whinney analyzed Pullman's historical and projected current assets in relation to its revenues. This analysis revealed that the levels of current assets, including working capital during the projection period, are below the median level of historical current assets *excluding* working capital. [Pullman Ex. 30.] Consequently, no significant amounts of cash will likely be available to be invested.

#### (e) *The Bank's Valuation is Unrealistic*

The Bank's valuation of Pullman is unrealistically high when viewed against Pullman's projected cash flows. Pullman has neither the capacity to borrow an additional $1 million to satisfy the Bank's inflated valuation nor the available cash flow to service the resulting increased debt level. [Pullman Ex. 135.] If Pullman were required to undertake additional borrowing, the drain on its cash flows for interest expense would prevent it from growing to regain its market share, and hence from achieving the cash flow levels which form the basis of both Pullman's and the Bank's valuations. Therefore, the Bank's insistence that Pullman has undervalued its estate by $1 million is inconsistent with the company's operations in the real world. However, this also means that the Plan is not feasible since no increased borrowing is available to satisfy the amounts found by the Court to be required by law but not offered to Wells Fargo.

#### (f) *Pullman's Valuation Viewed as a Whole*

Pullman's Business Plan must be viewed as a whole. Selecting individual business assumptions to modify, as Wells Fargo does in order to produce artificially higher value, is not a correct approach. A change in one assumption that increases value might require other modifications which decrease value. For instance, in order to achieve greater sales, Pullman would likely take jobs with lower profit margins and increase its overhead. The first modification would increase gross revenue, while the latter two changes would decrease net revenue. Pullman's historical financial statements reflect its inverse relationship between revenue levels and margins. [Pullman Ex. 3, pp. 33, 35.]

In addition, adoption of the modified assumptions suggested by the Bank would result in the Court making the unwarranted conclusion that Pullman's management did not intend to run Pullman's business as set forth in the Business Plan.

#### (g) *Optimistic Business Assumptions by Pullman*

Moreover, certain of the assumptions in the Business Plan which tend to increase revenue or decrease cost, and therefore increase value, may be overly aggressive. For instance, from a valuation perspective,

management's assumption, that Pullman's high margin Power Product business (which is a finite and declining market) will be replaced by a similar high margin product producing the same revenue, is most optimistic. Mr. Sullivan testified that management was unable to identify the product Pullman would use to replace its fire damper business. Consequently, applying a perpetuity multiple to the stream of revenue expected to be produced by Pullman's Power Product business results in a higher value than is warranted.

Pullman's Business Plan also projects gross margins that are higher than Pullman's historical averages for each of its three types of projects. This is an excessively optimistic assumption.

Similarly, under Pullman's Business Plan, expected revenues from the use of its remaining net operating losses are included at the full present value of the related tax savings. However, uncertainties in preserving net operating losses, or generating sufficient post-confirmation profits to utilize all available net operation losses, may make the discounting of projected revenue from the realization of net operating losses at least as appropriate as valuing that revenue as one hundred cent dollars.

Another such example is the inclusion of a $37,000 insurance refund in the first post-confirmation year of cash flows. The refund claim is disputed and may not be received at all, or it may not be received during the first year of the Business Plan. Either occurrence would reduce the projected net value of Pullman's future cash flows.

Finally, any number of Business Plan assumptions, such as the projected revenues from Special Projects, the extent of Pullman's anticipated gross margins, or the expected "days of revenue in net construction receivables," are only optimistic guesswork.

(h) *Conclusion as to Bank's Argued Increases in Value*

The foregoing and all the evidence have caused the Court to conclude that Wells Fargo's arguments for finding of greater value than Debtors propose are not realistic or persuasive. But some of the same considerations also cast into question the cash flow projected by Debtors as necessary to make the Plan feasible.

36. *The Courts Conclusions as to Value from all the Evidence.*

Considering the foregoing evidence and arguments, the Court concludes that Debtors' approach and computation as to valuation was correct in the main and generally adequate to enable this Court to find the appropriate value. As many other judges have found, this Court recognizes that all valuations of going business value are only educated estimates in the absence of one or more buyers ready, willing and able to purchase the business. Given the two years of bankruptcy wherein no buyer appeared, the closely held nature of a business in which its president is a key and perhaps irreplaceable leader, and the inherent uncertainties of future business in the construction industry, an arms length outside buyer is not foreseeable and was not obtained. Consequently, based on expert evidence and historic results, this Court must fix a value through the use of imperfect theories, formulas, and assumptions. Some of the assumptions are uncertain (e.g. use of the "Peer Group" of companies to formulate a capitalization rate despite many differences between those companies and the Debtors.) However, use of uncertain assumptions are inherent in this process. While this underlines the inherently uncertain quality of the analysis, economic assumptions that all experts agreed on provide persuasive evidence even where they are uncertain.

However, the Court need not and does not accept one assumption that came from the Debtors and is more a wild leap of faith than a reasoned but uncertain assumption. That is the projection by Debtors of future "large commercial construction" business to be obtained by it in the years following its hoped-for confirmation.

Debtors project that revenue from that source will rise from $6,964,000 in 1988 to $7,268,000 in 1989, and then jump to a

whopping $10,037,000 in 1990 after confirmation. [Pullman Ex. 3, pp. BP–33.] That projects an increase of more than one-third in one year. This projection as a major component in the valuation of cash flow. However, it is based almost entirely on an anticipated "bounce" from the hoped-for reorganization. No firm evidence of actual specific new jobs and customers support this projection which is therefore a mere hope.

Wells Fargo sought a finding of value even higher than that proposed by Debtors, so it did not question the projection by Debtors for large commercial projects. The Committee and this Court does. Based on historic data (and Debtors' prior shortfalls in revenues predicted in prior hearings before this Court), it is doubtful that revenues from large commercial construction will be as high as projected. The Debtors' exaggerated projection inflates its computation of value. A five percent shortfall from Debtors' projections is likely. This reduces the Debtor's total valuation computation of $5,547,000 by $516,000. [Pullman Ex. 46, Summary of Sensitivities.]

Rounding off the result recognizes that valuation here is only an informed approximation. The Court finds the going concern value of Debtors to be $5,000,000.

*The Committee's Further Arguments*

Other optimistic elements in the Debtors' computations have been questioned by the Committee which seeks to have the valuation reduced even more. While the questions raised are significant, the projections on those matters are judgments that have been accepted by Debtors, their counsel; all the experts, and Wells Fargo. In the absence of evidence that compels the Court to reject the assumptions (as the Court did for the projected income from "large commercial construction"), we do not reject those further assumptions questioned by the Committee.

37. It would not be proper in the light of all the evidence to find lower projected gross margin assumptions than these contained in the Business Plan. For example, the 21% projected gross margin for "Special Projects" is the result of an average of the years 1983, 1984, 1985, 1987 and 1988. [Pullman Ex. 3, BP 11.] However, during Debtors Chapter 11 operations, since Debtors have revamped financial systems and focused on local, profitable projects, their gross margin on "Special Projects" in 1987 and 1988 have averaged 28.65%. [*Id.*] The same analysis holds true for projected gross margins in "Large Commercial," which the Business Plan projects at 12.5%. [*Id.* at BP 12.] Again, Debtors have averaged large commercial margins of 13.65% during the 1987 and 1988 Chapter 11 period. [*Id.*] The Business Plan has already dropped the projected gross margin for Large Commercial to a number lower than the gross margins obtained during the Chapter 11 operating period. Finally, John Goldwyn testified that Pullman's gross margin assumptions were more "conservative" by 2% (i.e. 2% lower), than Ernst & Whinney's previous assumptions. [Tr. pp. 45–46, 6/1/89.] The further 1% reduction suggested by the Committee is not supported by the weight of evidence.

38. The Committee's argument regarding the replaced Power Product Assumption is also misplaced. In 1993, Power Products are projected to represent only 5% of Pullman's total revenues. [Pullman Ex. 3, BP 34.] The replacement assumption does not necessarily require an assumption that a new product line with an identical gross margin be developed. Likewise, Pullman Ex. 74, dealing with executive salaries, does not lead to a lowering of value. There is no persuasive evidence that Pullman's executives are being underpaid. Mr. Sullivan's testimony clarified that the "Industry Average Officer's Compensation" referred to in Pullman Ex. 74 reflected primarily "profitable companies that are publicly held", as opposed to privately-held companies such as Pullman where the officers are major shareholders who have incurred enormous losses prior to placing their company into bankruptcy. [Tr. p. 143, 6/5/89.]

39. The Committee's further arguments are not supported by the weight of evidence.

*"Costs to Reorganize"*

40. Debtors' valuation and calculation of Wells Fargo's Class 4 secured claim includes their deduction of "Costs to Reorganize" totalling $2,273,000 from their most likely aggregate value of the estate ($5,547,000) in order to arrive at the value of Wells Fargo's secured claim as $3,274,-000. [Pullman Ex. 50.]

41. Debtors would deduct the following "Costs to Reorganize":

| | | |
|---|---|---|
| a) | Priority Pre–Petition Tax Claims | $1,536,000 |
| b) | Alternative Minimum Tax Liability | 83,000 |
| c) | Professional Fees | 560,000 |
| d) | Mechanic Lien Claims (Class 1) | 48,000 |
| e) | Priority Wage Claims (Class 2) | 46,000 |
| | TOTAL | $2,273,000 |

[Pullman Ex. 50.] Those "Costs to Reorganize" comprise pre-petition unsecured claims and post-petition professional fees. A number of those claimants may have potential personal claims against the Goldwyns. None of these claimants have claims senior in priority to Wells Fargo's secured claim. The mechanic lien claim of $48,000 has been paid from the adequate protection escrow account by order of this Court in connection with the settlement of the Sheraton claim. Items (a) and (e) constitute pre-bankruptcy unsecured corporate debt, not a cost incurred or investment made during the administration of the estate in an effort to reorganize the estate. Item (a) includes disputed and unsecured claims. [Test. of J. Goldwyn; and W.F. Ex. 9.] The professional fees have not been allowed by interim or final order. Item (b) is an estimate that may not be payable until late 1990. [Test. of Sullivan, Tr., pp. 79–80, 6/5/89.] Finally, all of the "Costs to Reorganize" are estimates. [Test. of Sullivan, Tr. p. 78, 6/5/89.]

42. For reasons set forth in the Conclusions of Law hereinbelow, Debtors cannot deduct those "Costs to Reorganize" from the aggregate value of the estate prior to calculating Wells Fargo's allowed secured claim. Corporate value is determined free of corporate debt. [Pullman Ex. 89, p. 51.] The term "Costs to Reorganize", as used by Debtors, is simply corporate debt. The experts testified that a discounted cash flow analysis is calculated on a debt-free basis to determine the value of the entire "pie" of assets available to satisfy claims of corporate debtholders and equityholders. [*See* Pullman Ex. 49, Note (a).]

43. The only corporate liabilities considered when utilizing a discounted cash flow approach are current operating expenses, such as labor, materials, overhead, salaries, and other items that must be paid to generate the cash inflows. Rappaport notes "these cash flows are relevant for estimating corporate value because they represent the cash available to compensate debtholders and shareholders." [Pullman Ex. 89, p. 52.] Rappaport states that after corporate value is calculated, corporate debt is deducted to determine shareholder equity. [*Id.*] Dr. Hamada testified that, generally, corporate value minus corporate debt equals shareholder equity. [Tr. pp. 139–140, 6/6/89.] In this case, after calculating corporate value, the corporate debt, consisting first of Wells Fargo's claims and then "Costs to Reorganize," would then be deducted to determine shareholder equity.

44. The proposed deductions are improper for numerous factual reasons, including: a) Wells Fargo is a secured creditor with a first lien on all assets of the estates; b) the "Costs to Reorganize" are estimates; c) the $1,536,000 of priority prepetition tax claims are (i) subject to dispute, and, (ii) include $500,000 of taxes upon which the Goldwyns have potential personal liability; d) the estimated potential alternative minimum tax liability is subject to reduction through post-confirmation tax planning and will not be due and payable, if ever, until late 1990; e) the professional fees of $560,000 have not been allowed by Court order; and f) none of the $2,273,000 of "Costs to Reorganize" have been allowed, after notice and hearing, under 11 U.S.C. § 506(c). By proposing to deduct "Costs to Reorganize" from Wells Fargo's collateral value before calculating Wells Fargo's secured claim, Debtors improperly attempt to bootstrap unsecured claims into super-priority claims or claims under 11 U.S.C. § 506(c).

45. The weight of evidence does not support Debtors' allocation argument ("ec-

onomic theory") that "Costs to Reorganize" are proper deductions. The supposed "economic theory" is, in fact, a camouflaged legal argument. Messrs. Sullivan and Hamada testified that they "assumed" that "Costs to Reorganize" had to be paid due to conversations with Debtors' counsel. They were "informed" that to confirm a plan "Costs to Reorganize" had to be satisfied. Moreover, Mr. Sullivan's testimony regarding the priority of such deductions as a matter of economic theory is not entitled to any weight because, as discussed in the Conclusions of Law hereinbelow, the law—not economic theory,—establishes relative rights and priorities of competing creditors in bankruptcy proceedings.

## Liquidation Values

46. On March 9, 1988, this Court found after evidentiary hearing that 25% of Debtors' Net Accounts Receivable would be recovered upon a forced liquidation. [W.F. Ex. 38.] On June 30, 1988, after another evidentiary hearing, the court found that "the quality and collectibility of receivables has improved since the case was filed." [W.F. Ex. 40.] Although the collectibility of accounts receivable on a forced liquidation basis may not have improved since June 30, 1988, their collectibility has not decreased since that date. Both John Goldwyn and Lester Goldwyn testified that accounts receivable are more collectible at the present time, on a forced liquidation basis, than they were as of May 1, 1987. [Test. J. Goldwyn, P. 87, 6/8/89.] Moreover, Debtors collected almost 100% of the Sheraton account receivable upon their liquidation of their Connecticut operations. Thus, the collectibility of Debtors' accounts receivable in a Chapter 7 liquidation would be at least 25% of book value.

47. Debtors' net accounts receivable of $3,250,000 includes a $350,000 account receivable from the Federal Reserve project, a project which has been substantially completed. [Pullman Ex. 3, BP 36.] This $350,000 account receivable should be substantially collectible. Moreover, Debtors' accounts receivable due from the manufacture and sale of "fire dampers," a proprietary product, have a greater collectibility than a typical construction receivable.

48. Debtors' Net construction receivables total about $3,250,000. Fred Caruso testified on behalf of the Debtors that Net Accounts Receivable would be collectible in the 10% to 20% range, yielding a range of from $325,000 to $650,000. The pretrial submissions indicated, however, that Mr. Caruso believed that Debtors' accounts receivable would be collectible in the 10% to 25% range, yielding a range of from $325,000 to $812,500. [W.F. Ex. 56.] Frank Bernatowitz analyzed Debtors' receivables and concluded they would be 10% collectible. Mr. Bernatowitz's opinion, however, assumed consensual rather than aggressive collection of accounts receivable, and without sufficient basis he assigned zero value to $467,000 of "doubtful" accounts receivable. Mr. Bernatowitz also assumed that claims under one contract could be offset against monies due under another contract. Although such offsets may be common in the industry, there is no evidence that such offsets are allowed under the terms of the contracts as they would be enforced in court. Likewise, Mr. Bernatowitz and Debtors would offset "lienable payables" against net accounts receivable. Yet John Goldwyn testified that the projected "lienable payables" are not necessarily properly perfected liens. [Tr. p. 87, 6/1/89.] Thus, the court's previous finding (W.F. Ex. 39], that "lienable payables" will not be deducted from net construction accounts receivable, stands. Mr. Bernatowitz did not assess the collectibility of accounts receivable pursued by a trustee, through litigation, with nationwide service of process to compel accounts debtors to defend claims in a Chicago bankruptcy court. Thus, the experts established a range of collectibility of from 10% to 25% of the $3,250,000 of Net Accounts Receivable based upon their overly pessimistic analysis.

49. A witness called by Debtors, Morgan Fitch of South Chicago Savings Bank,

was an unbiased, credible witness. Mr. Fitch testified that: (1) he recommended that South Chicago Savings Bank loan $1,000,000 to Debtors secured by Non–Cash Assets because he believed that the liquidation of those assets would realize $1,000,000; and (2) he would discount Debtors' accounts receivable by 25% and equipment and inventory by 50%. This testimony supports the Court's prior findings that, upon forced liquidation, Debtors could recover approximately 25% of the book value of their net accounts receivable. Based upon that and all the other evidence previously referred to, the Court finds that the forced liquidation value of Debtors' net accounts receivable is 25%, or approximately $812,500, as of June 30, 1989. Mr. Fitch testified further that Pullman provided him with an appraisal of their equipment reflecting a liquidation value of $467,000. [W.F. Ex. 53.] The Court finds that to be the liquidation value of such equipment.

50. Debtors utilize a "highly conservative" asset valuation approach by listing fixed assets at "hammer value" on their balance sheets. [W.F. Ex. 45; Test J. Goldwyn, Tr. p. 37, 6/1/89.] This "highly conservative" asset valuation approach results in rock-bottom valuation findings being urged upon this Court by Debtors. Debtors incorrectly state that the court's previously Adequate Protection Formula valued Fixed Assets based on book values. [Debtors' Post–Trial Proposed Findings, p. 127.] In fact, Fixed Assets were valued by an appraisal that was placed into evidence. [W.F. Ex. 38.] Debtors have not persuasively supported their argument that a 25% recovery of inventory is overstated.

The Court finds that, upon a Chapter 7 liquidation, Wells Fargo would likely recover the following:

| | | |
|---|---|---|
| a) Cash | | $1,117,000 |
| b) Net Accounts Receivable– $3,250,000 at 25% | | 812,500 |
| c) Inventory–$465,000 at 25% | | 116,250 |
| d) Fixed Assets [W.F. Ex. 53] | | 467,000 |
| e) Patent [Pullman Exs. 113–116] | | 67,000 |
| TOTAL | | $2,579,750 |

Upon a Chapter 7 liquidation, Wells Fargo would therefore receive a significant amount larger than the $1,855,000 in cash

it is offered at confirmation under Debtors' Proposed Plan.

51. Additionally, upon a Chapter 7 liquidation, the Trustee could seek recovery of potential preference claims having a face amount in excess of $3,500,000 [Pullman Ex. 2, at Ex. 16] and other claims. Other assets having a book value of $468,000 would be liquidated at some value to Wells Fargo. These additional claims and assets would render additional value to Wells Fargo and should be sufficient to cover the administrative costs of a Chapter 7 liquidation. Finally, given Debtors' admitted "hopeless insolvency," in a Chapter 7 liquidation, a Trustee is likely to abandon Wells Fargo's collateral; thus, the costs of a liquidation would be reduced. The Court finds that Wells Fargo could recover significantly more on account of its secured claim in a Chapter 7 liquidation than the $1,855,000 cash that Debtors propose to pay to Wells Fargo upon confirmation on account of Wells Fargo's secured claim.

*Value of Lester and Norma Goldwyn's Investment*

52. To fund the Plan, Lester and Norma Goldwyn (the "Goldwyns"), the present shareholders, will invest $450,000 into the reorganized Debtors in exchange for 60% of the stock of the reorganized Debtors.

53. The book value of the Goldwyns' stock, representing 60% of the equity, will be as follows:

| Date | Value |
|---|---|
| Confirmation | $ 885,000 |
| December 31, 1989 | $ 994,200 |
| December 31, 1990 | $1,279,800 |
| December 31, 1991 | $1,465,800 |
| December 31, 1992 | $1,636,200 |
| December 31, 1993 | $1,875,600 |

[Pullman Ex. 3, BP 36.] Moreover, 60% of Debtors' potential net income after tax could yield significant returns to the Goldwyns. [*Id.* at BP 33.] Considering the foregoing and the internal rate of return, the salary, the control factor, the discharge of potential personal liabilities, and the true going concern value, the Court must find that the Goldwyns' $450,000 contribution does not equal or exceed the value of their retained interest in the Debtors

[W.F. Ex. 54.] even taking their loans and guarantees into account.

54. If the Plan is confirmed and professional fees are paid, Lester Goldwyn will not have to satisfy personal guarantees of fees allowed to Morris Anderson & Associates, Towbin & Zazove, Ltd. and Ernst & Whinney.

55. If the Plan is confirmed and the pre-petition tax obligations are paid, the Goldwyns will not have to satisfy potential personal liability in an approximate amount of $500,000.

56. If the Plan is confirmed, the business that was started by Lester Goldwyn's father-in-law, and John Goldwyn's grandfather, will continue to operate, and John and Lester Goldwyn will receive salaries, in 1989, in excess of $225,000.

57. A successful Plan would yield additional economic and non-economic benefits to the Goldwyns. [Test. of J. Goldwyn, Tr. p. 66, 6/1/89.]

58. Based on all the evidence the court finds that the present going concern value of Wells Fargo collateral is worth more than the $3,274,000 offered by Debtors. The going concern value of Debtors' existing estate, Wells Fargo's collateral, and, therefore, Wells Fargo's allowed secured claim, is $5,000,000. The liquidation value of the Debtors' estate would, moreover, exceed the cash amounts offered to Wells Fargo at confirmation. Finally, the value of new capital offered by the Goldwyns who would retain stock in the reorganized Debtor would be less than the value of their retained interests.

59. Factual statements contained in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

2. Debtors have the burden of proof to establish that the Plan meets all of the requirements of 11 U.S.C. § 1129. On Wells Fargo's motion to lift the automatic stay, Wells Fargo has the burden of proof on the issue of Debtors' equity in property under 11 U.S.C. § 362(g)(1); Debtors have the burden of proof on all other issues under 11 U.S.C. § 362(g)(2).

3. Wells Fargo voted its Class 4 secured claim and its Class 5 unsecured claim to reject the Plan. Since Wells Fargo would be paid under the Plan much less than is due it, Class 4 and Class 5 are impaired under the Plan. Thus, the Plan does not meet the requirements of 11 U.S.C. § 1129(a)(8). Debtors, however, seek confirmation of the Plan under 11 U.S.C. § 1129(b).

4. For reasons more fully discussed below, the Plan cannot be confirmed because:

(a) the Plan does not provide Wells Fargo with payments having a present value equal to the going concern value of Wells Fargo's collateral;

(b) the Plan improperly deducts claims of pre-petition disputed unsecured creditors and unallowed administrative claimants from the value of Wells Fargo's collateral;

(c) the Plan unfairly discriminates with respect to Wells Fargo;

(d) the Plan is not fair and equitable;

(e) the Plan violates the absolute priority rule;

(f) although the "New Capital" exception to the absolute priority rule has survived the enactment of the Bankruptcy Code, the Plan does not meet that exception;

(g) the Plan does not meet the requirements of 1129(a)(7);

(h) the Plan is not feasible; and

(i) the Plan does not meet the requirements of § 1129(a)(7) (the best interests test).

5. The Plan improperly allocates value among competing claimants, violating "the basic rule of bankruptcy law that all valid secured claims come ahead of all valid unsecured claims, including claims for costs of administering a bankruptcy case." *In re Chicago Lutheran Hospital Ass'n*, 89 B.R. 719, 732 (Bankr.N.D.Ill.1988). The Plan violates this rule by proposing to dis-

tribute $2,273,000 of Pullman's reorganization value to junior creditors. The Plan treats Wells Fargo's secured claim in an unfair, inequitable and unfairly discriminatory manner.

### Valuation

■ 6. The value of Wells Fargo's Collateral that was entitled to adequate protection is not a *res judicata* determination with respect to the amount of its secured claim for allowance purposes on a plan of reorganization. [S.R. No. 95–989, 95th Cong.2d Sess. 68 (1978); H.R. No. 95–595, 95th Cong. 1st Sess. 365 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787]. However, the court's previous finding regarding the forced liquidation value of Wells Fargo's collateral has some weight here as a finding of forced liquidation value as of the petition date. Wells Fargo objected to Debtors' use of the Bank's cash collateral, and the court found, as of the petition date, that the forced liquidation value of Wells Fargo's collateral was $3,182,500. The Committee would now have the court confirm a Plan that provides Wells with less money on a going concern basis than it would have received in 1987 from a forced liquidation. Debtors now contend that after more than two years of effort Debtors' going concern value is only $91,500 greater than the previously established forced liquidation value. Moreover, most of this "increased" value is attributable to interest earned on funds deposited into Wells Fargo's adequate protection escrow.

7. The Plan cannot be confirmed because Wells Fargo will not receive payments equal to the full going concern value of its collateral.

> ... [C]reditors are entitled to have the full value of the property, whether "present or prospective, for dividends or only for purposes of control", first appropriated to payment of their claims.

*Consolidated Rock Products Co. v. Du Bois,* 312 U.S. 510, 529, 61 S.Ct. 675, 686, 85 L.Ed. 982 (1941) (citation omitted). Thus, Wells Fargo, as the senior secured creditor, is entitled to have the full value of the Debtors' existing estate dedicated to payment of its senior secured claim before claims of professionals and pre-petition unsecured tax creditors are satisfied. A secured creditor must be offered cash payments totalling at least the amount of its secured claim and with a present value at least equal to the value of the collateral, or be allowed to reach its collateral. *Bankruptcy,* by Robert Ginsberg, ¶ 13,605, p. 13,069 (1988). Since Wells Fargo has a lien on all Pullman assets, the value of its collateral is equal to the full value of the estate.

■ 8. In valuing the allowed amount of Wells Fargo's secured claim for purposes of the Plan, "[v]alue should be determined by the purpose of the valuation and the proposed disposition or use of the property." *Barash v. Public Finance Corp.,* 658 F.2d 504, 512 (7th Cir.1981). Here, Debtors propose to retain and use Wells Fargo's collateral (accounts receivable, contracts, contract rights, machinery, equipment, inventory, etc.) in the ongoing operations of the reorganized entity, and to pledge the collateral as security for $1,330,000 of new loans from South Chicago Savings Bank and Lester and John Goldwyn. A forced-sale or liquidation value of Wells Fargo's collateral, for purposes of determining the allowed amount of its Class 4 secured claim for Plan purposes, is improper.

A going concern analysis is the appropriate approach for establishing the allowed amount of Wells Fargo's secured claim. *See, e.g., In re Fiberglass Industries, Inc.,* 74 B.R. 738 (Bankr.N.D.N.Y.1987).

9. "Payments under a plan must have a value ... equal to the allowed secured claim." 5 *Collier on Bankruptcy* ¶ 1129.03, p. 1129–64, (15th ed. 1989). The Debtor's proposed Plan cannot be confirmed because it does not offer to pay Wells Fargo the value of the estate on account of its allowed secured claim.

### Cramdown Requirements

10. Since Wells Fargo voted its Class 4 secured claim and Class 5 unsecured claim to reject the Plan, the Plan fails to meet the requirements of Section 1129(a)(8).

The Plan may, however, be confirmed if it meets the requirements of Section 1129(b). "Section 1129(b) is intended to protect dissident classes." 5 *Collier on Bankruptcy*, ¶ 1129.03[3][a], p. 1129–47 (15th Ed.1989).

11. Section 1129(b)(2) sets forth the minimum standards which must be met for confirmation. The Fifth Circuit has recently explained:

> A plan which does not meet the standards set forth in § 1129(b)(2) cannot be 'fair and equitable.' However, technical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is 'fair and equitable.' ... Section 1129(b)(2) sets forth minimal standards plans must meet. However, it is not to be interpreted as requiring that every plan not prohibited be approved. A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is 'fair and equitable.'

> \* \* \* \* \* \*

> A plan that is not fair and equitable with respect to an impaired secured creditor cannot be confirmed on the basis that such inequity is necessary to protect junior creditors. If market conditions are such that an effective plan of reorganization cannot be developed that is fair and equitable to dissenting creditors, [the secured creditor] is entitled to foreclose on its liens.

*In re D & F Construction, Inc.*, 865 F.2d 673, 676–676 (5th Cir.1989) (citations omitted). These considerations here mandate denial of confirmation.

12. Debtor's Plan does not comply with the requirements of § 1129(b)(2). The overall facts clearly establish that the impaired secured creditor Wells Fargo is not treated "fairly and equitably" *vis-a-vis* every other class of claimants. The state law rights of Wells Fargo would enable it to foreclose on its liens on the Stock and all assets of the Debtors' estates. As the Seventh Circuit noted in *In re Stegall*, 865 F.2d 140, 143 (7th Cir.1989):

> A merely nominal benefit would not be commensurate with the cost to those

creditors of giving up the benefits, slight though they may turn out to be, of a liquidation, in which the land and other assets would be sold at auction and might fetch a higher price than anyone had expected.

A $91,000 increase over previously established forced liquidation value is, indeed, a nominal benefit. It is grossly inequitable and unfairly discriminatory to "cramdown" forced liquidation values in a case that does not involve a Chapter 11 liquidating plan. The quoted statement from *Stegall* is directly on point.

13. The Plan is not fair and equitable. Compared to the $3,274,000 offered to Wells Fargo, under the proposed Plan and in light of the history of this case Pullman would have paid: a) over $2,000,000 to its attorneys, consultants and accountants; b) over $2,500,000 to pre-petition trade creditors; c) over $800,000 on account of pre-petition, unsecured union claims; d) over $1,500,000 to pre-petition, unsecured tax claims; and, e) over $300,000 (projected) to unsecured trade creditors. The Plan, in effect, attempts to take value that should be distributed to Wells Fargo, and distributes that value to junior claimants "to protect" those junior claimants. Because certain junior claimants have potential personal claims against the Goldwyns, and the Goldwyns would obtain a release from the estate from potential avoidance actions, the Plan truly "protects" the Goldwyns at Wells Fargo's expense.

14. The Plan "discriminate[s] unfairly" against Wells Fargo in violation of Section 1129(b)(1).

> Reducing 'discrimination' to its bare essentials, a dissident class must not only receive 'fair and equitable' treatment but the class must also receive treatment which allocates value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the Debtor.

5 *Collier on Bankruptcy*, ¶ 1129.03[3], p. 1129–50 (15th Ed.1989). The Plan unfairly discriminates against Wells Fargo's Class 4 secured claims. In essence, it would subordinate Wells Fargo's allowed secured claim

to unsecured claims of tax claimants and professionals. Wells Fargo secured claim is proposed for worse treatment than claims of junior claimants.

### "Costs to Reorganize" Cannot Be Deducted From the Aggregate Value of the Estate

■ 15. Debtors seek to charge Wells Fargo's collateral with $560,000 of unallowed professional fees and with $1,536,000 of disputed, unsecured, pre-petition tax claims, characterizing such claims as "Costs to Reorganize." However, the indicated "Costs to Reorganize" cannot be deducted from the gross value of the collateral prior to determination of the value of Wells Fargo's interest in that collateral.

16. To value a secured creditors' claim, "the amount of debt secured by senior liens" must be deducted from the value of the collateral to arrive at the value allocable to junior claims. 3 *Collier on Bankruptcy*, ¶ 506.04, p. 506–19 (15th ed. 1989). To the contrary, Debtors seek to deduct junior unsecured claims from the value of the collateral to arrive at the amount of Wells Fargo's senior secured claim.

17. Debtors argue that "economic theory" mandates that "Costs to Reorganize" be deducted from the value of the estate before calculating Wells Fargo's secured claim. Such theory is not supported by law, logic, or authoritative economic evidence.

18. Debtors argue that if "Costs to Reorganize" are not paid, the Plan cannot be confirmed and going concern value will not be realized. That argument could be made in virtually every bankruptcy case, because successful reorganization is the predicate of realizing going concern value. The issue here, however, is not the amount of junior claims that must be paid under § 1129(a)(9) to achieve confirmation and reorganization. The issue is the going concern value of the reorganized assets, free and clear of the pre-petition debt. While Section 1129(a)(9) of the Bankruptcy Code requires payment of administrative claims, it does not convert unsecured claims into allowed § 506(c) claims or "superpriority"

administrative claims. The Plan cannot lawfully subordinate Wells Fargo to junior unsecured claims.

19. Section 506(c) of the Bankruptcy Code provides that only certain unsecured claims are chargeable to a secured creditor's collateral. Section 364 provides that only certain claims are entitled to super-priority status. The Plan's proposed treatment of Wells Fargo would render Sections 506(c) and 364 mere surplusage by illegally charging Wells Fargo with claims described in § 1129(a)(9).

20. Debtors' allocation theory would require reversal of fundamental and well-established legal principles that: (a) a secured creditor is entitled to full priority over junior creditors; and, (b) a secured creditor's collateral is not charged with costs of administration except under the rigorous standards of 11 U.S.C. § 506(c).

21. The cases cited by Debtors do not support their argument that unsecured, disputed, pre-petition tax claims and unsecured, unallowed, professional fees may be deducted from a secured creditor's collateral value. The SEC cases cited by Debtors deal with capital expenditures, an item Debtors already deduct in their discounted cash flow analysis. [Pullman Ex. 45.] Moreover, the cases cited by Debtors follow the basic rules that mandate denial of confirmation of the Plan. *See, e.g., In re 620 Church St. Bldg. Corp.*, 299 U.S. 24, 26–27, 57 S.Ct. 88, 89, 81 L.Ed. 16 (1936) (affirming district court finding that when property in question has no value over and above claims of senior creditors, the property has no equity, the debtor is insolvent, and claims of junior creditors "are of no value and hence no ... cash should be distributed under the plan in respect to their claims."); *In re American Reserve Corp.*, 841 F.2d 159, 162 (7th Cir.1987) (citations omitted) ("fair and equitable is a term of art that means that senior interests are entitled to full priority over junior ones"); *Muskegon Motor*, 366 F.2d at 525 ("absolute priority ... [means that] the plan must preserve for each set of interests the priority which it held before the reorganization"); *Citibank, N.A. v. Baer*, 651 F.2d

1341, 1346 (10th Cir.1980) (citations omitted)

> ("a plan may be approved only if it fully protects the senior creditors' preferential rights to the assets. This 'absolute priority' rule is designed to protect unsecured creditors against shareholders and senior mortgagees against junior mortgagees.... It is the right of priority that must be protected.")

The court here is faced with the same factual situation faced by the Supreme Court in *Church Street* where debtor was insolvent. Junior claimants can receive nothing in such a case.

22. Debtors' economic theory to support their proposed allocation of value is contradicted by the approach of Dr. Hamada in *Jartran*, 44 B.R. 331. In *Jartran*, Dr. Hamada followed authoritative economic theory, in that corporate value is first determined on a debt-free basis; then, corporate debt is subtracted to determine shareholder equity. In *Jartran*, Dr. Hamada:

> *first calculated Debtor's going concern value* [ ... This represents the value of Debtors' assets managed in a particular way; that is, the value of the assets so managed is reflected in the cash flow forecast associated with Debtor's business plan] *unencumbered by the reorganized debt*. He then estimated the market value of the reorganized debt and subtracted that value from the going concern value of the firm. The residual was reported as the value of the shareholders' equity in reorganized Jartran.
> (Emphasis supplied).

*Id.* at 352.

23. In this case, consistent with *Jartran*, the court must first calculate corporate value on a debt-free basis. The Court must then, as a matter of law, adjudicate the competing priorities of the pre-petition corporate debtholders. The Debtors did not follow the authority of *Jartran*. Rather than first calculating "corporate value" and then subtracting "reorganized debt" to establish "shareholder equity," Debtors subtract certain "reorganized debt" ("Costs to Reorganize") from "corporate value" to establish a new corporate value, which they characterize as the value of Wells Fargo's secured claim.

24. In this case, the pre-petition "reorganized debt" consists of Wells Fargo's claims and "Costs to Reorganize." *Jartran* did not adjudicate competing rights and priorities of the holders of the pre-petition "reorganized debt." In *Jartran*, Dr. Hamada followed the basic economic theory that corporate value is determined on a debt-free basis.

### *"Costs to Reorganize" are not § 506(c) Claims*

25. The unsecured claims called "Costs to Reorganize" could only be deducted from Wells Fargo's collateral value if they were claims allowed under 11 U.S.C. § 506(c). Section 506(c) provides that:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of such property to the extent of any benefit to the holder of such claim.

The "Costs to Reorganize" have not been allowed here as Section 506(c) claims after notice and hearing pursuant to Bankruptcy Rule 9014. The burden of proof is on Debtors to establish that $1,536,000 of disputed pre-petition tax claims and $560,000 of projected, but unallowed, professional fees, are allowable under Section 506(c). *Brookfield Production Credit Ass'n. v. Borron*, 738 F.2d 951, 952 (8th Cir.1984). Proof of direct benefit is required and the Section 506(c) burden is not met by possible or hypothetical benefits. *In re Flagstaff FoodService, Corp.*, 739 F.2d 73 (2nd Cir. 1984) *later appealed*, 762 F.2d 10 (2nd Cir. 1985). Debtors have not met their burden to prove that the $2,273,000 of indicated "Costs to Reorganize", or any portion thereof, are properly allowable under § 506(c).

26. Because the asserted "Costs to Reorganize" are not properly allowed claims under Section 506(c), they cannot be deducted from the value of Wells Fargo's collateral. To recover expenses incurred during the bankruptcy proceedings under Section 506(c), the claimant must prove

"that the expenses (1) were necessary, (2) benefited [the secured creditor], and (3) were reasonable." *Matter of Trim–X, Inc.*, 695 F.2d 296, 299 (7th Cir.1982).

> Traditionally administrative expenses have not been charged against secured creditors. The reason for that rule is that a trustee in bankruptcy acts not on the authority of [secured creditors] and for their interest, but on the authority of the court and for the interest of the general creditors. An exception to that general rule has been recognized, however, when expenses of preservation are incurred primarily for the benefit of the secured creditor ...

*Id.* at 301. (citations omitted) The rationale for this rule applies with equal force to debtors-in-possession as it does to trustees.

27. That portion of the "Costs to Reorganize" relating to professional fees cannot be deducted from the value of Wells Fargo's collateral.

> As a general rule, expenses of administration must be satisfied from assets of the estate not subject to liens. Should [Debtor's] estate have no unencumbered funds, that fact would not obligate [Wells Fargo] as secured creditor to finance a Chapter 11 proceeding except to the limited extent provided by 11 U.S.C. § 506(c) ...

*In re EES Lambert Associates*, 62 B.R. 328, 338 (Bankr.N.D.Ill.1986) (citations omitted). This Court, in *EES Lambert*, cited with approval the following language from *In re American Resources Management Corp.*, 51 B.R. 713, 719 (Bankr.D. Utah 1985):

> Post-petition attorneys' and accountants' fees are administrative expenses and may not be given priority *over existing liens* and superpriority claims.... Unless there is equity in the collateral, administrative claimants cannot look to a creditor's encumbered property to provide a source of payment for their claims. (Emphasis added).

Here, since Wells Fargo's lien encumbers all assets of the Debtors' estate, "Costs to Reorganize" cannot be satisfied from, or deducted from, the value of Wells Fargo's collateral.

28. The pre-petition priority tax claims of $1,536,000 did not directly benefit Wells Fargo, were not incurred to preserve Wells Fargo's collateral, and did not actually benefit Wells Fargo. "Pre-petition expenses are generally not recoverable under § 506(c)." 3 *Collier on Bankruptcy*, ¶ 506.06, pp. 506–59 (15th Ed.1989). *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 13 (2nd Cir.1985) held that post-petition tax claims were not allowable under § 506(c). The $1,536,000 of pre-petition, unsecured, disputed tax claims cannot be allowed under 11 U.S.C. § 506(c), nor can they be deducted from the value of the estate prior to arriving at the value of Wells Fargo's secured claim.

29. The evidence did not establish that the $560,000 of professional fees directly benefited Wells Fargo, or were incurred to preserve Wells Fargo's collateral. Only a small portion thereof attributable to work on liquidating the Sheraton claim for benefit of Wells Fargo has thus far been found without objection to qualify under § 506(c).

30. If Debtors' theory of deducting every dollar of professional fees from a secured creditor's collateral valuation were adopted by this Court, debtor's attorneys generally would be given incentive to engage in costly, time-consuming litigation, in hopes that eventually their legal bills would equal or exceed the value of the secured creditor's collateral, thereby enabling debtors to pay zero to the secured creditor. Generally, attorneys' fees in a Chapter 11 case, even a successful case, are not chargeable to a secured creditor if they are incidental to the reorganization, in the absence of showing a "clear and direct" benefit under § 506(c). *See* 3 *Collier on Bankruptcy*, ¶ 506.06, pp. 506–62, 64 (15th Ed.1989). *See also In re Chicago Lutheran Hospital Ass'n*, 89 B.R. 719 (Bankr.N. D.Ill.1988).

31. The cases cited by Debtor are easily distinguishable, because in each the secured creditor impliedly consented to the claims that were ultimately allowed under § 506(c), or the expenses met § 506(c) crite-

ria. *In re McKeesport Steel Castings Co.,* 799 F.2d 91 (3rd Cir.1986) involved the sale of the debtors as a going concern where the secured creditor consented to (1) its cash collateral being used to pay utility bills and (2) an order granting the utility a super-priority claims. In *McKeesport,* but for the service supplied by the utility, there would be no going concern to sell; thus, the utility bills were properly allowed, and paid from the proceeds of the sale. *In re AFCO Enterprises, Inc.,* 35 B.R. 512 (Bankr.D.Utah 1983), a trustee was appointed on the secured creditor's request. The trustee then sought reimbursement. The court found that the secured creditor was the only party that benefited from the services rendered by the trustee. Neither *McKeesport* nor *AFCO* involved a Chapter 11 confirmation hearing on a plan of reorganization. Neither *McKeesport* nor *AFCO* involved a case, like this one, where debtors contended after two years of reorganization effort that the going concern value of the enterprise was roughly equal to the forced liquidation value of the enterprise as of the petition date.

32. The Debtors' attempt to distinguish *Chicago Lutheran Hospital,* 89 B.R. 719 is flawed. Their argument is that *Lutheran Hospital* did not involve "a successful reorganization." Of course, this case is also not a successful reorganization. The issue in *Lutheran Hospital* was similar to the issue here, and that decision is instructive here.

33. The cases cited by Debtors under 11 U.S.C. § 506(c) are not on point here. The evidence did not establish that any of the "Costs to Reorganize" are allowable under § 506(c). Nor did the evidence establish that the disputed pre-petition unsecured tax claims and the unallowed professional fees were reasonable, necessary and quantitatively benefited Wells Fargo. Indeed, we find no authority holding that pre-petition unsecured tax claims are allowable under § 506(c). Cases cited by Debtors involving utilities and consensual disposition of a secured creditor's collateral are not on point. Finally, not a single case reported under 11 U.S.C. § 1129 adopts the Debtors' argument that, when valuing a secured creditor's collateral on a going concern basis for plan confirmation purposes, pre-petition tax claims and attorneys' fees should be deducted prior to determining the going concern value of a creditor's secured claim.

34. This Court concludes that none of the asserted "Costs to Reorganize" are properly deductible from the value of the estate prior to determining Wells Fargo's allowed secured claim. Therefore, the Pullman Plan understates Wells Fargo's allowed secured claim by $2,273,000.

### The Plan Cannot Be Crammed Down Because it Fails to Pay Wells Fargo the Going Concern Value of its Collateral

35. The Plan cannot be confirmed under 11 U.S.C. § 1129(b) because it does not provide Wells Fargo with payments having a present value equal to the going concern value of Wells Fargo's collateral. This Court found that the going concern value of Wells Fargo's collateral is $5,000,000. The Plan proposes payments totalling $3,274,000.

### The New Capital Exception to the Absolute Priority Rule Survived Enactment of the Bankruptcy Code

36. The absolute priority rule provides that:

a dissenting class of unsecured creditors must be provided for in full before any junior classes can receive or retain any property under a reorganization plan. The rule had its genesis in judicial construction of the undefined requirement of the early bankruptcy statute that reorganization plans be fair and equitable. The rule has since gained express statutory fore, and was incorporated into Chapter 11 of the Bankruptcy Code adopted in 1978. See 11 U.S.C. § 1129(b)(2)(B)(ii).

*Northwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988) (citations omitted).

37. The pre-Code absolute priority rule was summarized by Justice Brandeis as

follows: "to be fair and equitable under the [absolute priority rule], a plan of reorganization must not accord participation to junior interests unless such interests are backed by equity in the debtor's property after prior claims have been satisfied in full." Brandeis, 51 Yale L.J. at 86–87, citing *Case v. Los Angeles Lumber Products,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). Justice Brandeis also stated the exception to the absolute priority rule: "[o]f course participation may be accorded junior interests where they make a full monetary contribution to the enterprise." *Id.* at n. 10. *See also* Blum and Kaplan, *The Absolute Priority Doctrine in Corporate Reorganizations,* 41 U.Chi.L.Rev. 651, 652. ("In a sense, the absolute priority doctrine does prescribe a general rule: before a class of investors can participate in a reorganization, all more senior classes must be compensated in full for their claims, measured on the basis of their priorities upon involuntary liquidation, unless the junior class contributes to the reorganized enterprise something that is reasonably compensatory and is measurable."). Thus, application of the absolute priority rule requires the court to focus on the value of the existing estate, without augmentation by extrinsic sources of value or new capital.

38. As indicated in Blum and Kaplan, "[t]he function of the absolute priority doctrine has in essence been to set guidelines for carrying on [plan] negotiations, largely by validating or invalidating certain lines of argument and by fixing boundary marks upon the areas within which negotiation is allowable." 41 U.Chi.L.Rev. at 653. Stated differently, "[t]he absolute priority doctrine can be characterized as a way of structuring negotiations so that they are sufficiently disciplined to be held within permissible areas and to permit judicial review." *Id.*

39. The absolute priority doctrine was born and judicially developed in proceedings where the primary issue before the court was the solvency or insolvency of the debtor undergoing reorganization. Junior classes of stockholders and creditors would argue that the reorganized company had sufficient going concern value so that their interests should be included under the plan. This contention was usually premised on complex, but hotly contested, valuation arguments. Thus, in order to avoid the delay and expense of protracted litigation, it was common for plan proponents to urge the court to accept an inflated valuation of the debtor.

40. However, the inflated values often resulted in the Plan being infeasible and the reorganized debtor being required to undergo further rehabilitative efforts. The tension between "fairness" and "feasibility" has been summarized as follows:

> [A] plan of reorganization, in addition to providing a fair and equitable participation for the various classes of claimants, must satisfy the fundamental requirement of feasibility. The corporation must emerge from the reorganization process with a capital structure adapted to its future ability to earn. The requirement that a plan be feasible will normally necessitate a reduction in fixed charges and hence some alteration in the rights and privileges of security holders in the old corporation. *This emphasis upon feasibility thus appears to work at cross purposes with the rule that prior interests be absolutely preserved.*

Brandeis, 51 Yale L.J. at 96–97 (emphasis supplied).

41. "[C]ourts first read the doctrine into the statute in order to prevent recurrence of ineffectual reorganization adjustments under which inordinate prices were paid to avert threatened delays, nuisance claims, and occasional 'sweetheart' allocations to juniors." Blum and Kaplan, 41 U.Chi.L. Rev. at 653. Thus the new capital exception to the absolute priority rule is a doctrine having a separate legal and economic rationale.

42. Where new capital is exchanged for an interest in the reorganized debtor, the fundamental reasons for application of the absolute priority rule are no longer present. The infusion of new funds: (i) diminishes the likelihood that worthless securities will be issued, (ii) helps to insure

plan feasibility, and (iii) creates an objective negotiating framework when cash is the subject of negotiations among parties to a reorganization proceeding. Holders of junior claims and interests can no longer use the threat of litigation to acquire an interest in the reorganized debtor, but instead, must exchange "money or money's worth" for that interest.

43. The new capital exception retains its vitality as a necessary and obvious corollary to the new codified version of the absolute priority rule, as several recent decisions have held, *Matter of Yasparro*, 100 B.R. 91, 99 (Bankr.M.D.Fla.1989); *In re Snyder*, 99 B.R. 885, 888 (Bankr.C.D.Ill. 1989), or assumed, *see e.g. First Bank of Whiting v. Kham & Nate's Shoes*, 104 B.R. 909, 916 (N.D.Ill.1989) (Holderman, J.).

*See also* Nimmer, *Negotiated Bankruptcy Reorganization Plans: Absolute Priority and New Value Contributions*, 36 Emory L.J., 1009, 1051–53 (1987):

Although developed under the former Bankruptcy Act, the new contribution concept applies in Chapter 11 cases. Section 1129(b) prohibits owners from retaining or receiving any property 'on account' of their prior interests unless creditors receive full value. In a new capital case, however, the source of the owners' interest in the reorganized company is their new contribution. Ownership is not retained 'on account' of their prior interest.

\* \* \* \* \* \*

New contributions do not require the consent of all affected creditors. By making a new contribution that the court approves, the owners have the *right* to ownership if at least one impaired class of creditors agrees to the plan. (emphasis in original).

44. The statute codifying the absolute priority rule is § 1129(b)(2)(B)(ii), which states:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(B) With respect to a class of unsecured claims—

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan *on account of such junior claim or interest* any property.

(emphasis supplied). The Trustee and the Bank argue that the enactment of § 1129(b)(2)(B)(ii) was intended to abolish the new capital exception to the absolute priority rule.

45. The Supreme Court and the Seventh Circuit both have stated that it has not been conclusively determined whether or not the "new capital" exception survived the codification of the Bankruptcy Code. *Ahlers*, 485 U.S. at 203, n. 3, 108 S.Ct. at 967, n. 3; *Stegall*, 865 F.2d at 142. *Stegall* expressly stated that this is an open issue in the Seventh Circuit.

46. The Supreme Court recognizes that the Bankruptcy Code is no different than any other statute.

The task of resolving the dispute ... begins where all such inquiries must begin: with the language of the statute itself. In this case it is also where the inquiry should end, for where, as here, the statute's language is plain, 'the sole function of the Court is to enforce it according to its terms.'

\* \* \* \* \* \*

The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.'

*United States v. Ron Pair Enterprises, Inc.*, —— U.S. ——, 109 S.Ct. 1026, 1030–1031, 103 L.Ed.2d 290 (1989) (citations omitted). *Ron Pair* noted that pre-Code practice may be looked at for "interpretive assistance", and "in an appropriate case a Court must determine whether Congress has expressed an intent to change the interpretation of a judicially created concept in enacting the Code." 109 S.Ct. at 1032. The Supreme Court also noted that such "appropriate" cases involve cases where the statutory language is "open to interpretation", and where a proposed interpreta-

tion "was in clear conflict with state or federal laws of great importance." 109 S.Ct. at 1032, 1033.

However, "[a]bsent a persuasive reason to the contrary, [courts] are to attribute to the words of a statute their common meaning." *Matter of Clark*, 738 F.2d 869, 872 (7th Cir.1984), citing *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981) and *Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981); *accord United States v. Locke*, 471 U.S. 84, 93–94, 105 S.Ct. 1785, 1791–1792, 85 L.Ed.2d 64 (1985) (as a general rule a statute should be read according to its literal terms); *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *United States v. Apfelbaum*, 445 U.S. 115, 121, 100 S.Ct. 948, 952, 63 L.Ed.2d 250 (1980).

47. In *Midlantic National Bank v. New Jersey Dep't of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), where the court discussed Congress' codification of the judicially created power to abandon burdensome estate assets, the court explained that unless a specific intent to change the law is manifest, it is presumed that congress did not intend to make such a change:

> The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. [citation] The Court has followed this rule with particular care in construing the scope of bankruptcy codifications.

*Id.* at 501 (citations omitted) (emphasis supplied). *Accord Kelly v. Robinson*, 479 U.S. 36, 50–51, 107 S.Ct. 353, 361–362, 93 L.Ed.2d 216 (1986).

48. Finally, statutory construction is a "holistic endeavor." *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988). Individual statutory provisions must be interpreted in light of the statute as a whole. *Mountain States Tel. & Tel. Co. v. Pueblo of Santa*

*Ana*, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985). Where the meaning of a particular provision of a statute is unclear, "we ask what interpretation would best advance the legislative purpose." *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1175 (7th Cir.1987); *Virtual Network Services Corp. v. U.S.*, 98 B.R. 343, 345 (N.D.Ill.1989).

49. We turn now to the language of § 1129(b)(2)(B)(ii) quoted above. By inserting the words "on account of such junior claim or interest" in § 1129(b)(2)(B)(ii), it is clear that Congress did not intend to preclude shareholders from participating as stockholders in the reorganized debtor "on account of" their new capital contribution. Instead, § 1129(b)(2)(B)(ii) merely codified the existing absolute priority rule as to dissenting classes of unsecured creditors. *Jartran*, 44 B.R. at 364–365; *Cf. Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 Am.Bankr.L.J. 133, 143 n. 80. Thus, the rule precludes junior equity interests from participating as shareholders of the reorganized debtor to the extent they do so "on account of such [existing] junior claim or interest."

50. There is nothing in § 1129(b)(2)(B)(ii), or its legislative history, that suggests Congress intended to modify seventy-five years of past judicial interpretation of the absolute priority doctrine or its new capital exception. If Congress had so intended, it would have made "that intent specific." *Midlantic*, 474 U.S. at 501, 106 S.Ct. at 759; *See also Davis v. Michigan Dep't of Treasury*, —— U.S. ——, 109 S.Ct. 1500, 1506, 103 L.Ed.2d 891 (1989) ("When Congress codifies a judicially defined concept, it is presumed, absent an express statement to the contrary, that Congress intended to adopt the interpretation placed on that concept by the courts.")

51. The Supreme Court opinion in *Midlantic*, 474 U.S. at 501, 106 S.Ct. at 759, observed that when Congress enacted § 1129(b)(2)(B)(ii) codifying the absolute priority rule, "Congress also presumably included [its] established corollary," the new capital doctrine established in *North-*

*ern Pacific Ry. Co. v. Boyd,* 228 U.S. 482, 508, 33 S.Ct. 554, 561, 57 L.Ed. 931 (1913); *Kansas City Terminal Ry. Co. v. Central Union Trust Co.,* 271 U.S. 445, 455, 46 S.Ct. 549, 551, 70 L.Ed. 1028 (1926) and *Case v. Los Angeles Lumber Products,* 308 U.S. at 117, 60 S.Ct. at 8 ("[the absolute priority rule] also recognized the necessity at times of permitting the inclusion of stockholders on payment of contributions, even though the debtor company was insolvent.") The new capital corollary to the absolute priority rule permits securities in a reorganized debtor to be acquired in exchange for new capital, but not, as § 1129(b)(2)(B)(ii) states, "on account of such junior claim or interest."

52. Further, to read § 1129(b)(2)(B)(ii) as the U.S. Trustee and the Bank suggest would foreclose Chapter 11 as a realistic option for closely held corporations and other small business entities. If, as the Trustee and Bank suggest, the only option available for owners of such businesses to preserve their ownership interest is to pay dissenting unsecured creditors in full under § 1129(b)(2)(B)(i), then as a practical matter there would be little incentive in most cases for the owners of such businesses to undergo the cost and effort of reorganization instead of liquidating and starting over.

53. However, the purpose of Chapter 11 is not to liquidate, but rather to rehabilitate, distressed businesses. *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 527, 104 S.Ct. 1188, 1196, 79 L.Ed.2d 482 (1984) ("... the policy of Chapter 11 is to permit successful rehabilitation of debtors ..."). Thus, the interpretation of § 1129(b)(2)(B)(ii) urged by the Trustee and the Bank would not promote the underlying purpose of Chapter 11. To the contrary, its adoption would limit use of Chapter 11 by closely held corporations and other small businesses. Consequently, the interpretation of § 1129(b)(2)(B)(ii) urged by the Trustee and the Bank would not "best advance the legislative purpose" of

Chapter 11. *Cf. Mechmet,* 825 F.2d at 1175.

54. The U.S. Trustee's resort to the absence of commentary about the new capital doctrine in the Bankruptcy Code's legislative history is also unpersuasive. In fact, resort to legislative history, "the ashcans of the legislative process," *Virtual Network, supra,* 98 B.R. at 345, is unnecessary to resolve this issue, and may indeed be inappropriate. *Id.* at 345–346, and cases cited therein.

55. As previously noted, the Supreme Court observed in *Midlantic:* "... if Congress intends for legislation to change the interpretation of a judicially created concept, it makes the intent specific." 474 U.S. at 501, 106 S.Ct. at 759. The Trustee contends that the absence of legislative history somehow demonstrates Congress' specific intent to change seventy-five years of consistent judicial interpretation of the "fair and equitable" standard in receivership and reorganization cases. The Trustee's argument on this ground is untenable.

·56. The Trustee also contends that Congress' failure to adopt the Bankruptcy Commission's ("Commission") proposal as to the absolute priority rule is evidence that stock in reorganized Pullman cannot be purchased for at least its fair value by its existing shareholders. The Trustee, however, misconstrues the Commission's proposal.[7]

57. Shortly after the Commission's Report was issued in 1973, Professors Blum and Kaplan published their analysis of the Report. *See Blum and Kaplan,* 41 U.Chi. L.Rev. at 651. Their article explains why the Report's suggestion on the absolute priority rule was not adopted by Congress. *Id.* at 668–684. In summary, the Report did not propose abolition of the absolute priority doctrine *in toto.* Rather, the Report recognized the impediment the absolute priority rule posed to the consolidation of Chapters X and XI.[8] As a solution, the

---

**7.** *Report of the Commission on the Bankruptcy Laws of the United States,* H.R.Doc. No. 93–137, 93rd Cong., 1st Sess. pt. I at 259 (1973) (the "Report").

**8.** The "fair and equitable" standard in Chapter XI cases was abandoned in 1952 and replaced with the "best interests" test. *See General Stores v. Shlensky,* 350 U.S. 462, 471, 76 S.Ct. 516, 521, 100 L.Ed. 550 (1956) (Frankfurter, J. dissent-

Report proposed that the absolute priority rule be modified as to equity owner-managers so that such individuals could participate as stockholders in the reorganized debtor *without* putting up new capital. *See Commission Report* § 7–303(4). *See also* Peeples, *Staying In: Chapter 11, Close Corporations and the Absolute Priority Rule,* 63 Am.Bankr.L.J. 65, 69 (198) ("In the course of its study, the Commission concluded that the narrow 'new contribution' exception to the absolute priority rule ought to be broadened to permit shareholder contributions in forms other than 'money or money's worth' to the reorganized company.") Thus, Congress' rejection of the Report is not probative of the issue raised by the Trustee and the Bank.

58. There is nothing in the underlying philosophy of Chapter 11 that requires the exclusion of existing equity holders' participation in the successor to the Chapter 11 debtor, provided fair value is paid for that participation. *See* § 1123(a)(5)(B), § 1123(b)(4); *cf. Matter of Met–L–Wood Corp.,* 861 F.2d 1012, 1019 (7th Cir.1988), *cert. denied sub nom., Gekas v. Pipin,* —— U.S. ——, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989) (current equity holder's purchase of estate assets on a going concern basis at a Chapter 11 sale upheld); *Matter of Andy Frain Services, Inc.,* 798 F.2d 1113, 1125 (7th Cir.1986) (former shareholder's designated agent of Chapter 11 debtor-in-possession may purchase estate assets for fair price upon notice).

59. In *Met–L–Wood,* all of the debtor's assets were sold on a going concern basis immediately after the Chapter 11 case was filed. 861 F.2d at 1015. The debtor's existing shareholder, through an undisclosed nominee, purchased the assets. *Id.* at 1016. Later, the Chapter 7 trustee sought to have the sale order set aside. In rejecting the Chapter 7 trustee's arguments, the court stated: "... we have difficulty understanding what the fuss is about. It is commonplace, and involves no impropriety,

for the debtor himself to bid at a foreclosure sale." *Id.* at 1019.

60. In reaching its decision, the *Met–L–Wood* court appeared to focus on the fairness of the price paid and the adequacy of the consideration creditors received for the estate's assets, but not on the identity of the purchaser. *Id.* at 1017. ("The determining considerations are pragmatic.") These same considerations apply with equal force to Pullman's Plan.

61. This was explained in *In re Marston Enterprises, Inc.,* 13 B.R. 514 (Bankr. E.D.N.Y.1981) where the court rejected the argument now being made in this case by the Trustee and the Bank. The *Marston* court first explained that nothing in the Bankruptcy Code indicated that the new capital exception to the absolute priority rule had been abolished, or that Chapter X precedent on the issue should be disregarded. *Id.* at 518. The *Marston* court then addressed the new capital issue on an economic basis:

> If $300,000 to $400,000 of new money were needed to fund the plan, and the consideration came from new investors who were not shareholders, it would not violate the fair and equitable rule to permit them to contribute capital and receive shares of stock in the reorganized corporation. There is no reason why investors of new capital who happen to be shareholders, whose equity interest as old shareholders is extinguished, should be disqualified from investing in the reorganized corporation, where their contribution is substantial, as is the case herein. It would not violate the fair and equitable standard.

*Id.*

*Debtor's Plan Fails to Come Within the New Capital Exception*

██ 62. The exception is simply stated:

> An equity-interest owner may retain an interest in the debtor corporation so long

ing). Application of the absolute priority rule to closely held corporations and other small businesses again became an issue when the consolidation of Chapters X, XI and XII of the Chandler Act began to receive serious consideration. *See Blum and Kaplan,* 41 Chi.L.Rev. at 663 n. 26.

as the owner invests new capital into the corporation.... The new capital investment must (1) represent a substantial contribution and (2) equal or exceed the value of the retained interest in the corporation.

*In re Potter Material Service, Ins.*, 781 F.2d 99, 101 (7th Cir.1986) (citations omitted).

63. The "New Capital" exception arises out of the following *dicta* from *Los Angeles Lumber*, 308 U.S. at 121–122, 60 S.Ct. at 10–11:

It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor.... Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made.... [T]he stockholders participation must be based on a contribution in money or in money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder.

This *dicta* implies that the "contribution" would be an investment of new equity, and that the "participation" would be participation as equity holders. Most cases require the equity owner to invest new capital. *See, e.g., Stegall*, 865 F.2d at 142 (even assuming there is a New Capital exception to the absolute priority rule, "sweat equity" is not such capital); *In re Witt*, 60 B.R. 556 (Bankr.N.D.Ia.1986).

64. *Los Angeles Lumber* calls for a review of "all the circumstances" in determining whether the "contribution" is equal to the "participation."

65. Lester Goldwyn's guarantee of a post-petition line of credit has some value, but it is not a substantial present contribution of money or money's worth because it represents a contribution promised in the future. *See Matter of 47th and Belleview Partners*, 95 B.R. 117, 119–120 (Bankr.W.D.Mo.1988).

66. A retained interest of a shareholder "has a value measured in terms other than net-worth." *In re AG Consultants Grain Div., Inc.*, 77 B.R. 665, 678 (Bankr.N.D.Ind. 1987). Thus, the value of Goldwyns' retained interest is worth more than the substantial net-worth figures reflected on Debtors' balance sheets. [Test of J. Goldwyn, Tr. pp. 65–66, 6/1/89.] "The mere control of a reorganized asset is a valuable asset." *In re Stegall*, 64 B.R. 296, 300 (Bankr.C.D.Ill.1986), *aff'd* 865 F.2d 140 (7th Cir.1989). Mr. Bail testified that the value of the Goldwyns' retained interest was, based on all the circumstances, worth more than their new equity contributions. [W.F. Ex. 54.] This credible testimony is buttressed by Mr. Sullivan's testimony regarding the non-economic detriment to the Goldwyns in the event the Plan is not confirmed.

67. The "New Capital" to be invested by the two Goldwyns who are to remain as stockholders does not, in view of all the circumstances, equal or exceed the value of their retained interest in the reorganized Debtors. They would invest new capital of $450,000 (not including their proposed loans and guarantee) into the Debtors, and become shareholders, officers and directors following confirmation. The Goldwyns would own and control 60% of the stock of the reorganized Debtors. Additional value to the Goldwyns may inure from either potential tax benefits or the value of control of the Debtors. *Potter*, 781 F.2d at 103. Potential future profits also render value to the Goldwyns. *Ahlers*, 108 S.Ct. at 969–970. Debtors' Business Plan projects substantial future profits.

68. In addition to the value of their equity interest and the value of control, confirmation of the Plan will yield other valuable benefits to the Goldwyns. If the Plan is confirmed, the Debtors will pay over $1,500,000 of pre-petition, unsecured tax obligations, thereby relieving Lester and John Goldwyn of the potential personal liability of approximately $500,000 of that debt which they now face. Moreover, the Plan proposes to provide members of the Goldwyn family with releases from their preference liability. The Goldwyns' family business, providing salaries in excess of $225,000 per year to family members in the

first year following confirmation, will be maintained. Lester Goldwyn's guaranty of the Debtors' professional fees would, in event of confirmation, not be called upon. These factors confer additional value on the Goldwyns' proposed retained interest in the reorganized Debtors, over and above value that may be reflected on financial statements.

69. The two Goldwyns' $450,000 equity investment is not "substantial" within the meaning of the "New Capital" exception, even taking into account their additional economic risk through loans and guarantees as we should. *First Bank of Whiting v. Kham & Nate's Shoes*, 104 B.R. 909, 917–918 (N.D.Ill.1989) (Holderman, J.). Cases that analyze whether or not the New Capital constitutes a "substantial" contribution do not look merely at the amount of the contribution, they look at the amount of the contribution in light of pre-petition claims. *See, e.g., In re Kendavis Industries International, Inc.,* 91 B.R. 742, 18 B.C.D. 105 (Bankr.N.D.Tex.1988) ($5,000,-000 contribution not substantial in light of pre-petition claims); *In re Olson,* 80 B.R. 935 (Bankr.C.D.Ill.1987); *Snyder,* 99 B.R. 885. Thus, to gauge whether or not the Goldwyns contribution is "substantial", the Court must compare the contribution to the total pre-petition claims and the amount of debt to be discharged under the Plan.

70. Here, Debtor's pre-petition obligations, including some that have been paid from Wells Fargo's cash collateral during the case, are as follows: Wells Fargo, $8,038,138 [W.F. Ex. 44]; unsecured claimants, $8,000,000 [Pullman Ex. 2, p. 20]; tax claims, $1,536,000 [Pullman Ex. 64]; non-current liabilities, $856,000 [Pullman Ex. 64]; other long-term debt, $887,000 [*Id.*]; trade claims paid post-petition, $2,549,000 [Pullman Ex. 2, Ex. 15]; union claims, $800,000; thus, pre-petition claims total $22,666,000. The Goldwyns' $450,000 capital contribution represents less than 2% of total pre-petition claims. The Plan proposes to discharge Wells Fargo's approximately $8,038,000 claim with a payment of $3,274,000, and proposes to discharge the $9,743,000 of general unsecured claims, non-current liabilities and other long term debt with a payment having a present value of $336,000; thus, the Plan would discharge at least $12,428,000 of debt. The Goldwyns' $450,000 contribution represents less than 4% of the amount of debt discharged.

71. The proposed contribution is "not a substantial contribution of new capital sufficient to justify the stockholders retaining their interest." *Kendavis,* 18 B.C.D. at 109. In *Kendavis,* the new capital contribution was 1% of pre-petition debt. The Plan here is "inexplicably generous to stockholders when compared with the treatment of senior classes of creditors." *Kendavis,* 18 B.C.D. at 109. Moreover, during the term of the Plan, "no provision [is] made for the creditors to share in any potential 'up-side' growth of the company." *Kendavis,* 18 B.C.D. at 109. The up-side growth potential in this case, as revealed in Debtors' projected financial statements, is considerable. The *Kendavis* court found that "the debtors' plan was designed exclusively to benefit the shareholders." Pullman's Plan was designed primarily to benefit the Goldwyns.

[The] plan does not meet the requirements of the exception to the absolute priority rule enunciated in the *Ahlers* case. By providing for retention of their interest ... without benefiting unsecured creditors, the [debtors] have not treated the unsecured creditors in a "fair and equitable" manner under 11 U.S.C. § 1129(b). The [debtors] could make the plan fair and equitable by providing that any cash flow in excess of the anticipated amount in the plan would be paid for unsecured creditors on a *pro-rata* basis until they are paid in full.

*In re Bohman,* 77 B.R. 639, 642 (Bankr.S.D.Oh.1987).

72. Additionally, the Plan's treatment of Class 7 claimants violates the absolute priority rule. Class 7 claimants are subordinated debentureholders. Thus, they are junior in priority to Wells Fargo's unsecured claim. The Plan provides that these claimants will be released from potential preference liability. A release from a cause of action constitutes property of

value; if a release did not have value, nobody would ever request one. The Class 7 claimants' receipt of a release under the Plan would violate 11 U.S.C. § 1129(b)(2)(B)(ii); thus, the Plan cannot be confirmed over Wells Fargo's objections. [*See,* Pullman Ex. 2, Ex. 12 thereto, and Pullman Ex. 1, § 4.7.]

73. The Plan cannot be confirmed because it unfairly discriminates, it is not fair and equitable, it violates the absolute priority rule, and does not meet requirements of the new capital exception to that rule.

### *The Plan Does Not Meet the Best Interests of Creditors Test*

█ 74. The proposed Plan does not meet the requirements of Section 1129(a)(7) of 11 U.S.C., which mandates that Wells Fargo is entitled to "receive or retain [on account of its secured claim] property of a value . . . that is not less than the amount [Wells Fargo] would so receive if the Debtor were liquidated under Chapter 7." The proposed payment to Wells Fargo on account of its unsecured claim is not part of the § 1129(a)(7) equation. Wells Fargo would receive much more than $1,855,000 in a Chapter 7 liquidation based on projected June 30, 1989 asset values. In addition to projected cash of $1,117,000, Wells Fargo would receive substantially more than $738,000 in a Chapter 7 liquidation because:

(a) A 15% recovery on the $3,250,000 of net construction receivables would yield $487,500, a 20% recovery would yield $650,000, and a 25% recovery would yield $812,500;

(b) Wells Fargo could obtain at least $300,000 from the liquidation of machinery, equipment and leasehold improvements;

(c) Wells Fargo could obtain $116,250, which equals 25% of the book value, from inventory;

(d) Other Assets having a book value of $468,000 would yield some recovery;

(e) The fire damper patent has an approximate value of $67,000 in a liquidation;

(f) The Chapter 7 administrative costs, if any, could be satisfied by recoveries on preferences claims having a face amount of over $3,000,000, or would be small because a trustee is likely to abandon Wells Fargo's collateral due to lack of equity in a forced liquidation scenario.

75. The fact that the Plan proposes to transfer preference claims, and proceeds thereof to Wells Fargo is not meaningful here. This is because Wells Fargo already has a lien on all preference proceeds. Wells Fargo's lien arises based upon its pre-petition security interest in Debtors' causes of action and in the proceedings of Wells Fargo's Collateral. Any preferential transfer actions are causes of action to recover proceeds of Wells Fargo's Collateral. Accordingly, 11 U.S.C. § 552(b) provides that Wells Fargo's pre-petition lien in proceeds continues post-petition. *See In re Ellingsen MacLean Oil Co., Inc.,* 98 B.R. 284, 290–291 (Bankr.W.D.Mi.1989). Additionally, Wells Fargo has a lien on preferential transfer proceeds based on the court's previous orders. Those orders authorized the Debtors, over Wells Fargo's objections, to continue to use Wells Fargo's cash collateral (i.e. every dollar collected from Wells Fargo's collateral proceeds). Since the success of the case was problematic, the court granted Wells Fargo "a lien on all assets" of the Debtors. Thus, the Court granted Wells Fargo a lien on preferential transfers. *See Ellingsen,* 98 B.R. at 291–292. Moreover, on August 19, 1988, the Court approved a Settlement Agreement signed by Debtors and Wells Fargo on July 18, 1988, that provided that Wells Fargo had a finally allowed "secured claim against the Pullman Companies, and property of the Pullman Companies' bankruptcy estate." Finally, Debtors' judicial admission in its answer to Wells Fargo's Motion to Lift Automatic Stay is consistent with the above. Thus, Wells Fargo has a lien on Debtor's preference actions.

### *The Automatic Stay Must be Lifted*

█ 76. This case is over two years old. The present proposed Plan cannot be confirmed. It appears clear that a non-consensual cramdown plan is not feasible. There is not an effective reorganization in

process. Because the instant proposed Plan has been represented to be the best offer Debtors' will make, and parties have been unable to agree on a consensual Plan, there is no "reasonable possibility of a successful reorganization within a reasonable time." *In re 8th Street Village Ltd. Partnership*, 94 B.R. 993, 995 (N.D.Ill.1988), citing *Timbers*, 108 S.Ct. at 632.

77. The issue here is whether or not Debtors have any "reasonable possibility of a successful reorganization within a reasonable time." *Timbers*, 108 S.Ct. at 632. As the court stated in *In re Garsal Realty, Inc.*, 98 B.R. 140, 156 (Bankr.N.D.N.Y. 1989),

> Although [the creditor] may be adequately protected for the present, such a finding will not defeat [the creditor's] request for a lifting of the stay on the basis of Code § 362(d)(2).

Here, Wells Fargo's Motion to Lift the Automatic Stay was brought under § 362(d), and was not limited to § 362(d)(1). [*See*, W.F. Ex. 46, ¶ 7.] Where there is no reasonable possibility of a successful reorganization within a reasonable time, "the stay must be lifted and the creditor given the right to retake its collateral under applicable state law." *Garsal*, 98 B.R. at 157. Here, Pullman has had over a two-year "breathing spell" to reorganize; thus, a "reasonable time" to reorganize has passed. Debtors are not entitled to any more time to effect a reorganization. The automatic stay must be lifted for cause based upon 11 U.S.C. § 362(d). Wells Fargo has met its burden of proof under § 362(g). Because a successful reorganization is not in prospect and the Goldwyns resigned, the injunction under 11 U.S.C. § 105 enjoining Wells Fargo from exercising its rights against the stock was recently dissolved.

78. Wells Fargo has shown its interest in selling certain of Pullman's assets to certain executives of Scott Company of California. Since the proposed Plan cannot be confirmed and the stay must be lifted, Wells Fargo is entitled to pursue the possibility of a transaction with those persons. For the foregoing reasons, this court is now prepared to modify the automatic stay. For the same reasons, the adequate protection fund held in escrow, and all earnings thereon should be turned over to the Bank.

79. Any legal conclusions contained within the Fact Findings will stand as additional Conclusions of Law.

80. Other legal issues briefed by the parties need not be reached in view of the foregoing Findings and Conclusions.

WHEREFORE, the Court will separately enter orders denying confirmation of the Plan and otherwise granting relief to Wells Fargo in accord with the rulings herein.